629 A.2d 885

THE GILBERT SPRUANCE COMPANY, PLAINTIFF–RESPON-DENT, v. PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY, DEFENDANT–APPELLANT, AND IN-SURANCE COMPANY OF NORTH AMERICA, DEFENDANT.

Argued November 30, 1992—Decided July 21, 1993.

*Gerald M. Eisenstat* argued the cause for appellant (*Eisenstat, Gabage & Berman,* attorneys; *Mr. Eisenstat, Mitchell S. Berman,* and *Mark C. Schultz,* on the brief).

*Henry H. Janssen* argued the cause for respondent (*Rapp, White, Janssen & German,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

■ We granted certification, 130 *N.J.* 14, 611 *A.*2d 652 (1992), to address the sole question presented in the petition of defendant Pennsylvania Manufacturers' Insurance Company (PMA), namely, "whether a comprehensive general liability policy containing a pollution exclusion, issued by an out-of-state carrier and covering an out-of-state defendant's operations, should be construed pursuant to New Jersey law." In this case the waste alleged to be the

source of the pollution was generated in Pennsylvania and deposited in New Jersey. The trial court balanced the factors set forth in *Restatement (Second) of Conflicts of Laws (Restatement)* section 6 (1971) (hereinafter section 6), and determined that Pennsylvania law should govern. The Appellate Division reversed, 254 *N.J.Super.* 43, 603 *A.*2d 61 (1992), concluding that when waste predictably comes to rest in New Jersey, this state has the dominant significant relationship with the parties, the transaction, and the outcome of the controversy, and thus New Jersey law should govern. *Id.* at 51, 603 *A.*2d 61.

■ We agree with the Appellate Division's conclusion that when the parties to the insurance contract can reasonably foresee that a New Jersey waste site will receive the insured's waste products, New Jersey law should dictate the proper interpretation of the insuring agreement because this state had the dominant significant relationship. (By "waste site" we mean the place at which the waste comes to rest, irrespective of whether that location is a designated landfill.) We therefore affirm.

I

Plaintiff, The Gilbert Spruance Company (Spruance), is a Pennsylvania corporation that manufactures paint in Philadelphia. In the course of its operations during the 1970s and 1980s, Spruance consigned its waste to independent waste haulers, who transported the waste to dumps in New Jersey. Four of those dump sites—Helen Kramer Landfill, Scientific Chemical Processing site, Gloucester Environmental Management Services Landfill, and Swope Oil and Chemical site—are the basis of multiple toxic-tort claims for personal injury and property damage against Spruance and are now the subject of public remediation-enforcement actions by the New Jersey Department of Environmental Protection (NJDEP) (now the Department of Environmental Protection and Energy).

From 1971 through 1988, Spruance purchased primary and excess Comprehensive General Liability (CGL) policies from

PMA, a Pennsylvania corporation. The policies listed several locations of plant operations in various states, including Pennsylvania, Virginia, and North Carolina. PMA is licensed to sell property, liability, and workers' compensation insurance in numerous states, including Pennsylvania and New Jersey. The contracts at issue were negotiated and countersigned in Pennsylvania, and the premiums were paid there.

Each of the policies required PMA to provide a defense to Spruance for "suits" alleging liability for property damage or bodily injury that was insured under the policies in respect of occurrences or suits throughout the United States. From 1973 to 1988, the CGL policies issued by PMA to Spruance contained a standard pollution-exclusion clause, which provided that the insurance did not apply

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, release or escape is sudden and accidental * * *.

When Spruance submitted notice of the claims arising from the four New Jersey waste sites, PMA disclaimed coverage based on the pollution-exclusion clause.

Between 1988 and 1989 Spruance filed complaints against PMA and Insurance Company of North America (INA) seeking a declaration of coverage. (The case against INA was dismissed after the parties settled their differences). In March 1989, Spruance filed a motion for summary judgment to establish PMA's duty to defend. Denying that motion, the trial court conducted a section 6 analysis and declared that the law of Pennsylvania rather than that of New Jersey applied to the interpretation of the pollution-exclusion clause. The court held that under Pennsylvania law, the pollution-exclusion clause supported PMA's disclaimer because the "discharge, dispersal release or escape" of the waste materials was not considered to be "sudden and accidental." See *Lower Paxton Township v. United States Fidelity & Guar. Co.*, 383 *Pa.Super.*

558, 557 *A.2d* 393, 399, *appeal denied,* 523 *Pa.* 649, 567 *A.2d* 653 (1989). Under then-existing New Jersey law, however, "sudden and accidental" discharge could include the gradual release of pollutants. *See Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co.,* 218 *N.J.Super.* 516, 535–36, 528 *A.2d* 76 (App.Div.1987). The trial court therefore granted PMA's motion for summary judgment.

On appeal to the Appellate Division, plaintiff contended that the trial court had erroneously decided the choice-of-law issue. Relying primarily on the reasoning in *Leksi, Inc. v. Federal Insurance Inc.,* 736 *F.Supp.* 1331 (D.N.J.1990), and *Johnson Matthey, Inc. v. Pennsylvania Manufacturers' Association Insurance Co.,* 250 *N.J.Super.* 51, 593 *A.2d* 367 (App.Div.1991), both of which were decided after the trial court had ruled in this case, the Appellate Division reversed and held that New Jersey law would apply to the interpretation of the "sudden and accidental" wording in the pollution-exclusion clause. 254 *N.J.Super.* at 51, 603 *A.2d* 61.

The court recognized that the law of the principal location of the insured risk as understood by the parties, which *Restatement* section 193 makes controlling unless some other state has a more significant relationship to the parties and the transaction, does not govern when the insured operation or activity is predictably multi-state. 254 *N.J.Super.* at 50, 603 *A.2d* 61. In that situation, section 6 factors should be used to identify the state with the most significant relationship. *Ibid.*

In its section 6 analysis the Appellate Division apparently placed significant, if not controlling, emphasis on New Jersey's interest in securing financial resources both to remediate New Jersey toxic-waste sites and to compensate victims of New Jersey pollution. *Id.* at 47–48, 603 *A.2d* 61; *see J. Josephson, Inc. v. Crum & Forster Ins. Co.,* 265 *N.J.Super.* 230, 235–36, 626 *A.2d* 81, (Law Div.), *leave to appeal denied* (App.Div., July 1, 1993). The court also found that the justified—*i.e.,* objectively reasonable—expectations of the parties were protected because the parties could foresee that waste generated from a Philadelphia paint

factory would come to rest in New Jersey and that generator responsibility would be measured by New Jersey law. 254 *N.J.Super.* at 49, 603 *A.*2d 61; *see also Leksi, supra,* 736 *F.Supp.* at 1336 (finding foreseeable that waste generated in Pennsylvania would be deposited across Delaware River in New Jersey); *cf. General Metalcraft Inc. v. Liberty Mut. Ins. Co.,* 796 *F.Supp.* 794, 802 (D.N.J.1992) (stating, "With respect to foreseeability and the expectations of the parties, we agree about the foreseeability of hazardous waste products generated in an abutting state landing in New Jersey."). The court concluded that when out-of-state-generated waste predictably comes to rest in New Jersey and imposes legal liabilities here on the insured, New Jersey has the dominant and significant relationship with the parties, the transaction, and the outcome of the controversy. 254 *N.J.Super.* at 51, 603 *A.*2d 61.

In adopting the site-specific-uniformity approach, the court rejected the uniform-contract-interpretation approach that another panel of the Appellate Division had advocated in *Westinghouse Electric Corp. v. Liberty Mutual Insurance Co.,* 233 *N.J.Super.* 463, 559 *A.*2d 435 (1989). The court pointed out that in *Johnson Matthey,* it had characterized nationwide uniformity of policy interpretation as "an illusory goal, not truly achievable or necessarily preferable." 254 *N.J.Super.* at 49, 603 *A.*2d 61. The court concluded that "[s]ite-specific uniformity, on the other hand, is achievable, and represents a choice of the law of the jurisdiction that is most concerned with the outcome." *Id.* at 49–50, 603 *A.*2d 61. Moreover, the court noted, the failure to include a choice-of-law provision in the contracts "tends to show that uniform interpretation was not a conscious goal of the contracting parties." *Id.* at 50, 603 *A.*2d 61.

The court remanded so that the Law Division could determine the effect of the choice-of-law decision on the substantive-coverage issue. That New Jersey's law on the meaning of the pollution-exclusion clause, and particularly the "sudden and accidental" language therein, remains at variance with the current law in

Pennsylvania (the question having not been decided by that Commonwealth's highest court) is clear from our decision today in *Morton International Inc. v. General Accident Insurance Co.*, 134 *N.J.* 1, 629 *A.*2d 831. Were the law the same in both jurisdictions, we would not, of course, be confronted with a choice-of-law problem.

## II

Traditionally, the law of the place where the contract, including an insurance contract, was entered into determined the rights of the parties under the contract. *Buzzone v. Hartford Accident & Indem. Co.*, 23 *N.J.* 447, 452, 129 *A.*2d 561 (1957). In *State Farm Mutual Automobile Insurance Co. v. Estate of Simmons*, 84 *N.J.* 28, 36–37, 417 *A.*2d 488 (1980), we rejected the mechanical and inflexible *lex loci contractus* rule in resolving conflict-of-law issues in liability-insurance contracts. Instead, our courts have adopted a more flexible approach that focuses on the state that has the most significant connections with the parties and the transaction. *Bell v. Merchants & Businessmen's Mut. Ins. Co.*, 241 *N.J.Super.* 557, 561–62, 575 *A.*2d 878 (App.Div.), *certif. denied*, 122 *N.J.* 395, 585 *A.*2d 395 (1990); *McCabe v. Great Pac. Century Corp.*, 222 *N.J.Super.* 397, 399, 537 *A.*2d 303 (App.Div.1988). We held that because the law of the place of contract "generally comport[s] with the reasonable expectations of the parties concerning the principal situs of the insured risk," 84 *N.J.* at 37, 417 *A.*2d 488, that forum's law should be applied "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." *Ibid.* In making that determination, courts should rely on the factors and contacts set forth in *Restatement* sections 6 and 188. *Id.* at 34–35, 417 *A.*2d 488.

According to *Restatement* section 188, the general rule in contract actions is that the law of the state with the most significant relationship to the parties and the transaction under the principles stated in *Restatement* section 6 governs. *State*

*Farm, supra,* 84 *N.J.* at 34, 417 *A.*2d 488. Section 188 lists several relevant "contacts," according to their relative importance, to be considered in the section 6 analysis, such as the domicile, residence, nationality, place of incorporation and place of business of the parties, and the places of contracting and performance. Under section 6, the "general considerations germane to a court's conflict-of-law analysis" are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[*State Farm, supra,* 84 *N.J.* at 34, 417 *A.*2d 488.]

Although *Restatement* section 188 provides the choice-of-law rule in respect of contracts in general, *Restatement* section 193 provides guidance in applying section 188's "relevant contacts" to the special case of casualty-insurance contracts, such as CGL policies: the court should apply the law of the state that "the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties * * *." *Id.* at 610. *See Pittston Co. v. Allianz Ins. Co.,* 795 *F.Supp.* 678, 687 (D.N.J.1992) (applying section 193 and holding that New Jersey law controlled in environmental-coverage case when insured risk was located principally in New Jersey); *Johnson Matthey, supra,* 250 *N.J.Super.* at 60, 593 *A.*2d 367 (same); *Bell, supra,* 241 *N.J.Super.* at 563, 575 *A.*2d 878 (applying section 193 and holding that New Jersey law governed interpretation of "multi-peril" policy of insurance when insured risk was located in New Jersey). Section 193 is based on the rationale that for a number of reasons

the location of the risk is a matter of intense concern to the parties to the insurance contract. And it can often be assumed that the parties, to the extent that they

thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract. Likewise, the state where the insured risk will be principally located during the term of the policy has a natural interest in the determination of issues arising under the insurance contract.

[*Restatement, supra,* § 193 comment c.]

If the principal location of the insured risk is in a single state for a major portion of the insurance period, that location "is the most important contact to be considered in the choice of the applicable law, at least as to most issues." *Id.* § 193 comment b. However, the location of the risk has less significance when a movable risk is concerned or when "the policy covers a group of risks that are scattered throughout two or more states." *Ibid.*

Capitalizing on the flexible and interpretative nature of the "factors" set forth in *Restatement* section 6 and the "contacts" listed in *Restatement* section 188, as well as the rule of *Restatement* section 193 specifically pertaining to casualty-insurance contracts, our courts have created choice-of-law rules in the context of commercial insurance and pollution exclusion involving out-of-state waste generation, multi-state waste generation, and in-state waste generation with the waste ultimately coming to rest in New Jersey. The two main choice-of-law rules adopted by the Appellate Division are the uniform-contract-interpretation approach and the site-specific approach.

Under the uniform-contract-interpretation approach, the law of a single forum governs the interpretation of coverage under a casualty-insurance policy for multi-state claims arising from environmental damage in multiple jurisdictions. See, *e.g., Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.,* 846 *F.*2d 319, 321 (5th Cir.1988) (applying Texas law for claims of coverage under occurrences in Louisiana, Texas, and Oklahoma against insurers in New Hampshire, New York, Canada, Norway, and Sweden); *Borg–Warner Corp. v. Insurance Co. of North America,* 174 *A.D.*2d 24, 577 *N.Y.S.*2d 953, 956 (applying New York law for coverage of damage resulting from nineteen waste sites scattered around country), *leave to appeal denied,* 80 *N.Y.*2d 753, 587

*N.Y.S.*2d 905, 600 *N.E.*2d 632 (1992). Proponents of that approach contend that uniformity in contract interpretation deters forum shopping, *see National Starch & Chem. Corp. v. Great Am. Ins. Cos.,* 743 *F.Supp.* 318, 323 (D.N.J.1990), and advances both predictability, in that parties can more accurately forecast potential coverage, *Johnson Matthey, supra,* 250 *N.J.Super.* at 59, 593 *A.*2d 367, and the expectations of purchasers of comprehensive nationwide coverage, who believe that they have bought "a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the coverage." *Westinghouse, supra,* 233 *N.J.Super.* at 476, 559 *A.*2d 435.

The Appellate Division in *Westinghouse* adopted the uniform-contract-interpretation approach. *Id.* at 476–77, 559 *A.*2d 435. See also *National Starch, supra,* 743 *F.Supp.* at 323 (following *Westinghouse* and applying uniform-contract-interpretation approach regarding coverage for multiple claims arising from environmental-contamination sites in New Jersey and eleven other states). The plaintiff in *Westinghouse,* presented with thousands of bodily-injury claims and numerous property-damage claims arising from eighty-one sites located in twenty-three states, brought suit against 144 insurers for declarations of nationwide coverage for toxic-tort claims and site-remediation liability wherever located. 233 *N.J.Super.* at 465–66, 559 *A.*2d 435. On grounds of *forum non conveniens,* the Law Division severed and dismissed all claims for coverage arising out of events that had occurred outside New Jersey. *Id.* at 465, 559 *A.*2d 435. The Appellate Division reversed and held that the court should exercise jurisdiction over all claims for coverage within the insurance policies, whether the events giving rise to those claims had occurred in New Jersey or elsewhere. *Id.* at 475, 559 *A.*2d 435.

The *Westinghouse* court held that the plaintiff was "entitled to a single, consistent and final resolution of the choice of law question in a single comprehensive action which will bind it and all its

insurers," *id.* at 477, 559 *A.*2d 435, and that "[t]his task is obviously manageable if the law of only one state is required to be restated," *id.* at 478, 559 *A.*2d 435. The court reasoned as follows:

> While not intending to deprecate the legitimacy of local concern for and control over its own environmental contamination, we nevertheless cannot conceive that the operative contract language in a single set of insurance policies issued by a group of insurers for the purpose of providing integrated comprehensive coverage for nationwide risks could mean something different in every state of the union. Obviously, the liability of the insured as a tortfeasor for the governmental and private claims against it will be determined by state law, whose applicable rules may differ from state to state, and by applicable substantive federal environmental and toxic tort law as well. But when comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage.
>
> In our view, the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectation of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict-of-law terms, to suggest that more than one body of law will apply to a single contract.
>
> [*Id.* at 476, 559 *A.*2d 435 (citations omitted).]

Appellate Division cases since *Westinghouse* have acknowledged the persuasive force of its view that an insurance clause regarding pollution coverage should have only one meaning no matter where the policy applies, see *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*, 258 *N.J.Super.* 167, 198–99, 609 *A.*2d 440 (App.Div.1992); *Johnson Matthey, supra,* 250 *N.J.Super.* at 64, 593 *A.*2d 367, and that a court's task is to identify the state with the most significant relationship with the parties and the transaction, and then to apply that state's law, see *Diamond Shamrock, supra,* 258 *N.J.Super.* at 198, 609 *A.*2d 440; *Gilbert Spruance, supra,* 254 *N.J.Super.* at 50–51, 603 *A.*2d 61; see also *General Metalcraft, supra,* 796 *F.Supp.* at 802–03 (holding that New Jersey law governed because New Jersey, as predictable waste-site location, had most significant relationship to parties and transaction); *National Starch, supra,* 743 *F.Supp.* at 325 (applying most-significant-relationship test); *Leksi, supra,* 736 *F.Supp.*

at 1333–34 (same). Nevertheless, those and other cases have rejected the uniform-contract-interpretation approach in favor of the site-specific rule. See *Diamond Shamrock, supra,* 258 *N.J.Super.* at 198–99, 609 *A.*2d 440; *Gilbert Spruance, supra,* 254 *N.J.Super.* at 49–50, 603 *A.*2d 61; *Johnson Matthey, supra,* 250 *N.J.Super.* at 62–64, 593 *A.*2d 367; see also *General Metalcraft, supra,* 796 *F.Supp.* at 802–03 (applying New Jersey choice-of-law rule and holding that New Jersey law governed because waste-site was located in New Jersey); *Pittston, supra,* 795 *F.Supp.* at 687 (applying New Jersey choice-of-law rule and holding that New Jersey law governed because insured risks, petroleum terminal and storage facility, were located in New Jersey); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 788 *F.Supp.* 846, 851 (D.N.J.1992) (applying New Jersey choice-of-law rule and finding that New Jersey law governed because contracting parties could reasonably foresee that waste generated at tank-truck-cleaning facility in New Jersey would come to rest in New Jersey); *Leksi, supra,* 736 *F.Supp.* at 1336 (applying New Jersey choice-of-law rule and holding that law of New Jersey waste-site location governs if reasonably foreseeable that waste would come to rest in this state). The site-specific rule, as set forth in *Restatement* section 193, provides that a casualty-insurance policy should be interpreted under the substantive law of the state that the parties understood to be the principal location of the insured risk, unless another state has a more significant relationship to the parties, the transaction, and the outcome of the controversy under a *Restatement* section 6 analysis. *Restatement, supra,* § 193. When the waste-producing facility and the waste site are located in the same state, their common location makes the application of section 193 straightforward. *See Johnson Matthey, supra,* 250 *N.J.Super.* at 60, 593 *A.*2d 367; *accord Pittston, supra,* 795 *F.Supp.* at 687; *Diamond Shamrock, supra,* 258 *N.J.Super.* at 199, 609 *A.*2d 440.

In *Johnson Matthey,* a Pennsylvania corporation, Johnson Matthey, Inc., had its primary location and business in Pennsylvania and operated a manufacturing plant in New Jersey. 250 *N.J.Su-*

*per.* at 53, 593 *A.*2d 367. Johnson Matthey was exposed to liability for waste that had been generated in New Jersey and that had been deposited in four New Jersey sites. *Ibid.* Seeking coverage from its insurers, Johnson Matthey sought a ruling on which forum's substantive law governed resolution of the issues. *Id.* at 53–54, 593 *A.*2d 367.

The trial court ruled that Pennsylvania law applied, and the Appellate Division reversed. *Id.* at 54, 593 *A.*2d 367. The Appellate Division rejected the trial court's determination that New Jersey had "no significant interest in the financial aspects of cleaning toxic waste sites with insurance proceeds rather than the funds of [Johnson Matthey]." *Id.* at 57, 593 *A.*2d 367. The court commented that financial resources provided by insurance coverage

> can very well determine whether or not a waste site is remediated or a toxic tort victim is compensated. Not every polluter or other person responsible for an environmental wrong is financially sound, or is anxious to make personal assets available to satisfy adjudicated liabilities. New Jersey's paramount interest in the remediation of toxic waste sites, and in the fair compensation of victims of pollution, extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds.
>
> [*Ibid.*]

Moreover, the court found that Pennsylvania's interests were relatively remote. *Id.* at 58, 593 *A.*2d 367. The court stated that Pennsylvania "has no legitimate interest * * * in preventing the fair and predictable application of foreign law to Pennsylvania insurance contracts which are written to cover insureds' liabilities in other states." *Ibid.*

The court rejected the uniform-contract-interpretation approach of the trial court and *Westinghouse,* reasoning that uniform interpretation of an insurance contract does not have "sufficient value to overcome the significant governmental interest of the various jurisdictions where the insured risks are located, or where the insured entity predictably is going to incur legal liabilities." *Id.* at 59, 593 *A.*2d 367. It was troubled by the likelihood of conflict and confusion "[i]f each nationwide insurer comes to court with its own nationwide policy interpretation derived from a different state of

contracting * * *."  *Id.* at 61, 593 *A.*2d 367.  Moreover, the court recognized as elusive the goal of uniform contract-interpretation. *Id.* at 60, 593 *A.*2d 367.

> In sum, we see uniform interpretation of policy language as desirable, but not truly achievable.  If it is associated with the state of contracting, in these circumstances it is associated with an arbitrary and usually irrelevant choice, one which was downgraded for casualty insurance policies by *Restatement* § 193.  If uniformity is achieved on a site-specific basis, the uniformity will relate to a particular legal proceeding and may aid in its resolution.  The cost, however, is that it cannot help but make some multistate insurance policy language mean one thing in one state and something else in another.
>
> [*Id.* at 64, 593 *A.*2d 367.]

Additionally, the court recognized that had the parties placed a high value on uniformity in contract interpretation, they could easily have inserted a choice-of-law provision in the policies.  *Id.* at 59, 593 *A.*2d 367.

When discussing the choice-of-law rule to apply, the *Johnson Matthey* court recognized that in consideration of "multistate insurers, multistate insureds, and instantaneous interstate transmission of voice and document, it is not easy to identify a state of contracting."  *Id.* at 60, 593 *A.*2d 367.  Thus, the court found that to apply the directive in *State Farm, supra,* 84 *N.J.* at 43, 417 *A.*2d 488, that normally the law of the place of contracting will apply to interpretation of the insurance contract's terms, "would be a difficult and perhaps pointless exercise."  250 *N.J.Super.* at 60, 593 *A.*2d 367.  Instead, the court applied the site-specific rule of *Restatement* section 193 and held that New Jersey law should govern because the location of the insured risk, *i.e.,* the situs of Johnson Matthey's plant, was New Jersey.  *Ibid.*  Furthermore, the court found predictable that waste from a New Jersey plant would come to rest in New Jersey landfills.  *Ibid.*  In addition, the court reasoned that site-specific uniformity would provide certainty and consistency when the policy at issue covers multi-state risks because the parties can expect that policy-language interpretation will follow the law of the site of the risk.  *Id.* at 61, 593 *A.*2d 367.

In conclusion, the court offered the following choice-of-law rule:

We hold that a casualty insurance policy, wherever written, which is purchased to cover a New Jersey risk, alone or along with risks in other states, is subject to interpretation of its coverage and exclusion language according to New Jersey local law. Although this rule is peculiarly suitable to environmental litigation, in which large numbers of casualty insurance policies are involved, it is not limited to that setting.

[*Ibid.*]

In *Johnson Matthey* the court observed that "[f]or the purpose of our holding, covering a New Jersey risk means at least covering a property or operation owned, occupied or conducted in New Jersey. It may mean more, but we need not look further today." *Id.* at 62, 593 *A.*2d 367. The site-specific rule, as enunciated in *Johnson Matthey,* did not encompass the situation presented by this appeal, namely, an out-of-state facility that generates waste that predictably comes to rest in New Jersey, and a casualty-insurance policy that does not name or otherwise specifically identify a New Jersey risk.

When a principal location of risk, such as a manufacturing operation or activity, within the waste-site location is not identified by the contracting parties at the inception of the insurance policy, the "foreseeability" aspect of the site-specific rule has been extended to provide application of the law of the waste-site location. See *General Metalcraft, supra,* 796 *F.Supp.* at 802; *Leksi, supra,* 736 *F.Supp.* at 1336. In adopting such a rule in this case, 254 *N.J.Super.* at 51, 603 *A.*2d 61, the Appellate Division relied heavily on the federal district court decision in *Leksi, supra,* 736 *F.Supp.* 1331.

The plaintiff in *Leksi,* a Delaware corporation with its manufacturing facilities in Pennsylvania, had some of its waste transported to four landfills in New Jersey. *Id.* at 1332. The plaintiff had purchased from four national insurance companies certain CGL policies, which had been negotiated, signed, and delivered in Pennsylvania, *ibid.,* and the premiums for which had been paid in Pennsylvania. *Id.* at 1335. As a result of the disposal of its waste at New Jersey sites, Leksi was the defendant in a number of environmental-enforcement actions, and sought a declaration of coverage for those cases. *Id.* at 1332.

The court conducted a choice-of-law evaluation, weighing the principles set forth in *Restatement* section 6(2) and considering the quality of the contacts listed in *Restatement* section 188(2). *Id.* at 1333–34. The court found that applying the law of the waste-disposal state would facilitate interstate commerce because a State will be more willing to permit the disposit of toxic wastes in its jurisdiction if it can be assured that its law will be applied in determining liabilities for cleanup costs. *Id.* at 1334. It therefore applied New Jersey law because New Jersey could have no more compelling interest "than its interest in determining the availability of funds for the cleanup of hazardous substances located within its boundaries," *id.* at 1335; Pennsylvania's interests were insubstantial in comparison to New Jersey's, *id.* at 1335–36; the contracting parties could have expected that waste would be deposited in New Jersey, which is immediately adjacent to Pennsylvania, *id.* at 1336; because New Jersey was a foreseeable waste-site location and because the parties had chosen not to include a choice-of-law provision, they could likewise have foreseen that the law of New Jersey would control the insurance-coverage issue, *ibid.*; and the policies underlying the resolution of environmental problems of this nature, such as waste-site remediation, militated in favor of application of New Jersey law, *ibid.*

The *Leksi* court offered the following rule: "[I]n the absence of a choice of law provision, the state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there." *Ibid.* Objective foreseeability that the waste would ultimately be deposited in New Jersey was founded on the proximity of New Jersey to the waste-generation site and the fact that "there are as many or more landfills in New Jersey within close proximity to the Leksi plants than there are in Pennsylvania." *Ibid.*

## III

Summarizing the foregoing discussion, we conclude that in determining the choice-of-law rule to govern casualty-insurance

contracts, such as the CGL policies in this case, we look first to *Restatement* section 193. As stated previously, that section provides that the law of the state that "the parties understood was to be the principal location of the insured risk * * * [governs unless] some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties * * *." *Restatement, supra,* § 193. However, in certain cases when the "subject matter of the insurance is an operation or activity" and when "that operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes * * *." *Gilbert Spruance, supra,* 254 *N.J.Super.* at 50, 603 *A.*2d 61. In such situations, the governing law is that of the state with the dominant significant relationship according to the principles set forth in *Restatement* section 6. *Restatement* § 193; *see A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 741 *F.Supp.* 298, 301–02 (D.Mass.1990), *aff'd,* 933 *F.*2d 66 (1st Cir.1991). See *Leksi, supra,* 736 *F.Supp.* at 1333–36, and *J. Josephson, Inc., supra,* 265 *N.J.Super.* at 235–37, 626 *A.*2d 81, for examples of section 6 analysis.

Remaining, however, is the knotty problem of how to determine where the insured "risk" is located. "Defining the principal location of the insured risk is not a matter of superficial review. '[O]nly by close study of the context, if then, can one ascertain the precise sense in which [the term risk] is used.'" *A. Johnson & Co., supra,* 741 *F.Supp.* at 300 (quoting *Robert E. Keeton, Insurance Law,* § 1.2(b)(1), at 4 (1st ed. 1971)). In hazardous-waste cases, two potential principal locations of risk exist: the state of generation—here, Pennsylvania, or the state of disposal—here, New Jersey. *See A. Johnson & Co., supra,* 741 *F.Supp.* at 300. *But see Pittston, supra,* 795 *F.Supp.* at 692 (stating that principal location of insured risk was state within which waste-producing facility was situated). Comment b to *Restatement* section 193 provides that an insured risk "has its principal location, in the sense here used, in the state where it will be during at least the major portion of the insurance period." However, situations in which the insured risk cannot be located, at least principally, in a

single state and in which the location of the risk has less significance include "where the policy covers a group of risks that are scattered throughout two or more states." *Ibid.*

We are thus presented with two options: we can arbitrarily choose either the state of generation, *see Johnson Matthey, supra,* 250 *N.J.Super.* at 60, 593 *A.2d* 367, or the state of disposal, *see A. Johnson & Co., supra,* 741 *F.Supp.* at 301, as the principal location of the insured risk, and assign section 193 significance to that state; or "because the risk at issue here was to some degree transient, a more extended analysis pursuant to § 6(2) is appropriate to determine whether, apart from or in addition to § 193 significance, [New Jersey] or [Pennsylvania] has a more significant relationship to the transaction and the parties." *A. Johnson & Co., supra,* 741 *F.Supp.* at 301. We choose the latter.

Substantially for the reasons expressed by Judge Brotman in *Leksi, supra,* 736 *F.Supp.* at 1334–37, a factually-analogous case in which waste generated in Pennsylvania came to rest in New Jersey, we agree with the Appellate Division that when applying the principles enunciated in *Restatement* section 6 to a case in which out-of-state generated waste foreseeably comes to rest in New Jersey, New Jersey has the dominant significant relationship. That section 6 analysis is based on factors specific to New Jersey, such as our "urgent concern for the health and safety of [our] citizens," *Johnson Matthey, supra,* 250 *N.J.Super.* at 57, 593 *A.*2d 367, as "demonstrated by the enactment of the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 [to –23.24]; the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 [to –48]; the Sanitary Landfill Facility Closure and Contingency Fund Act, *N.J.S.A.* 13:1E–100 [to –176]; the Environmental Cleanup Responsibility Act, *N.J.S.A.* 13:1K–6 [to –35]; and the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 [to –60] * * *." *Ibid.*

We have no occasion to consider in this appeal the problem presented when waste generated in New Jersey predictably is disposed of in another state. In *Leksi* the court held without any qualification that "in the absence of a choice of law provision, the

state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there." 736 *F.Supp.* at 1336. Specifically, we express no view on the proposition stated in *J. Josephson, Inc.*, *supra*, that when another state is the foreseeable location of the waste-site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with the parties, the transaction, and the outcome of the controversy—an analysis that requires the court "to sift through and analyze, however laborious [the task], the competing and varied interests of the states involved * * *." 265 *N.J.Super.* at 239, 626 *A.*2d 81.

## IV

As a final note, we distinguish *Westinghouse* as a case that involved multi-state sites while this case involves only one site in one state. *See Sandvik, Inc. v. Continental Ins. Co.*, 724 *F.Supp.* 303, 312 (D.N.J.1989); *Union Carbide Corp. v. Aetna Casualty & Sur. Co.*, 212 *Conn.* 311, 562 *A.*2d 15, 20 (1989). Nonetheless, in adopting the aforementioned choice-of-law rule, we necessarily reject the uniform-contract-interpretation approach substantially for the reasons stated by the Appellate Division, *supra*, 254 *N.J.Super.* at 49–50, 603 *A.*2d 61, and by the court in *Johnson Matthey*, *supra*, 250 *N.J.Super.* at 58–63, 593 *A.*2d 367. See also *Travelers Indemnity Co. v. Allied–Signal, Inc.*, 718 *F.Supp.* 1252, 1258 (D.Md.1989) (supplemental memorandum), in which the court stated that

short of congressional intervention or a limited overruling of the *Erie* doctrine to permit the development of a federal common law of contracts intended to be nationwide in scope, the existing dichotomous lines of substantive rulings, the maze of conflicts laws and litigation strategies of insureds and insurers alike make the achievement of such uniformity an illusion. The next best available alternative— required by the interests of the fair and sound administration of justice—is the deliberate and impartial resolution of the issues by the courts of the states whose interests are immediately affected during the course of litigation which can be effectively managed.

## V

The judgment of the Appellate Division is affirmed and the cause is remanded to the Law Division for further proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.