285 N.J. Super. 575 (1995)
667 A.2d 1087
JOHNSON & JOHNSON AND ORTHO PHARMACEUTICAL CORPORATION, PLAINTIFFS-APPELLANTS,
v.
AETNA CASUALTY AND SURETY COMPANY, THE NORTH RIVER INSURANCE COMPANY, NORTHBROOK INSURANCE COMPANY AND CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, DEFENDANTS-RESPONDENTS, AND MUTUAL FIRE, MARINE AND INLAND INSURANCE COMPANY AND MISSION INSURANCE COMPANY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1995.
Decided December 11, 1995.
*576 Before Judges HAVEY, D'ANNUNZIO and BRAITHWAITE.
*577 Robert E. Christiansen argued the cause for appellants (Office of the General Counsel, attorneys; Patterson, Belknap, Webb & Tyler, of counsel; Mr. Christiansen on the briefs).
Michael B. Oropollo argued the cause for respondent Aetna Casualty & Surety Company (Harwood Lloyd, attorneys; Mr. Oropollo, of counsel and on the joint brief).
Bruce A. Tritsch argued the cause for respondent Northbrook Insurance Company (Feinberg & Tritsch, attorneys; Mr. Tritsch, of counsel and on the joint brief).
George Gerard Campion argued the cause for respondent North River Insurance Company (Tompkins, McGuire & Wachenfeld, attorneys; William B. McGuire, of counsel; Mr. Campion on the joint brief).
Paul R. Koepff argued the cause for respondent Central National Insurance Company of Omaha (Ruggerio & Leodori, attorneys; Mr. Koepff and Daren S. McNally, of counsel and on the brief).
The opinion of the court was delivered by HAVEY, P.J.A.D.
The question before us is whether excess liability policies issued by defendants to plaintiffs Johnson & Johnson (J & J) and Ortho Pharmaceutical Corporation (Ortho) afford coverage for punitive damage awards suffered by plaintiffs in two failure-to-warn, product liability actions. We conclude that the awards are not covered by the policies, since affording coverage on these facts would run counter to the underlying theory of punitive damages: to punish the wrongdoer and deter aggravated misconduct in the future. Insuring against the awards would therefore frustrate public policy. We accordingly affirm the summary judgment in favor of defendants.
Plaintiffs J & J and its subsidiary Ortho have their principal places of business in New Jersey. In 1976, defendants issued excess liability policies to plaintiffs under which the carriers have no liability to indemnify until the limits of an underlying liability *578 policy are exhausted. In that event, defendants are subject to liability for a proportional share of J & J's "ultimate net loss" not to exceed $14 million. The Aetna policy provides indemnification against "EXCESS NET LOSS arising out of an accident or occurrence during the policy period." "EXCESS NET LOSS" is defined as that which the insured "becomes legally obligated to pay ... as damages on account of any one accident or occurrence." The Central National policy indemnifies against "damages ... on account of ... [p]ersonal injuries ... caused by or arising out of each occurrence." The Northbrook and North River policies employ similar language.
During the terms of the policies, punitive damage verdicts were rendered against J & J and Ortho in two separate product liability actions, one in Kansas and one in Missouri. Both are the subjects of reported opinions. See Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 681 P.2d 1038, cert. denied, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); Racer v. Utterman, 629 S.W.2d 387 (Mo. Ct. App. 1981), appeal dismissed and cert. denied, 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982). In Wooderson, supra, 681 P.2d at 1042-43, the plaintiff had taken an oral contraceptive manufactured by Ortho and developed renal failure, hemolytic uremic syndrome and hypertension. She claimed that Ortho failed to warn the medical profession of dangerous side effects of its product of which it had or should have had knowledge based on existing research and scientific literature. Id. 681 P.2d at 1056-57. A special verdict interrogatory concerning punitive damages instructed the jury as follows:
If you find that plaintiff is entitled to recover, and you also find that the conduct of [Ortho] was wanton, then in addition to the actual damages to which you find plaintiff entitled, you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant [Ortho], and to deter others from like conduct.

[Emphasis added.]
The jury awarded plaintiff $2 million in compensatory damages and $2.75 million in punitive damages. The Kansas Supreme Court affirmed, finding that there was substantial evidence supporting the punitive damage award. Id. 681 P.2d at 1064-65.
*579 The plaintiff in Racer, supra, 629 S.W.2d at 391, was undergoing a dilation and curettage operation in which a disposable drape manufactured by J & J was being used. The drape caught fire during the surgical procedure and she was seriously burned. Ibid. The plaintiff claimed, and the court found, that the highly flammable surgical drape was an "unavoidably unsafe" product, and therefore unreasonably dangerous in the absence of appropriate warnings. Id. at 393-94; see Restatement (Second) of Torts § 402A (1963 & 1964). A jury question pertaining to punitive damages against J & J stated as follows:
If you find the issues in favor of Plaintiff ... and against Defendant [J & J] and if you believe that the conduct of Defendant [J & J] as submitted ... showed complete indifference to or conscious disregard for the safety of others, you may assess punitive damages in addition to any damages assessed....
The amount of punitive damages assessed against Defendant [J & J] may be such sum as you believe will serve to punish Defendant [J & J] and to deter it and others from like conduct.

[Emphasis added.]
The jury awarded plaintiff and her husband $382,500 in compensatory damages and $517,500 in punitive damages. Racer, supra, 629 S.W.2d at 391. The Missouri Court of Appeals reversed and remanded the punitive damage award, concluding that, while there was evidence to support a finding that there was indifference to or conscious disregard for the safety of others, the award must be reversed because the matter was not properly submitted to the jury. Id. at 396-97. According to the court, the fatal flaw in the instruction was that it did not require a finding of fault in placing a dangerous product in commerce, "and a finding of fault sufficient to justify punishment is essential to recovery of exemplary damages." Id. at 397. After remand, J & J settled the punitive damage claim for $355,237.
J & J and Ortho filed the present declaratory judgment action seeking indemnification from defendants for the punitive damage awards paid in Wooderson and Racer. Defendants moved for summary judgment dismissing the complaint and plaintiffs cross-moved. The motion judge granted defendants' motion and denied plaintiffs' cross-motion, finding that New Jersey's public policy *580 was consistent with the policies of Kansas and Missouri and that any choice-of-law determination was therefore "academic." The judge concluded that it is against public policy to insure against punitive damage awards.[1]
The thrust of plaintiffs' multi-part contention is that it does not violate New Jersey's public policy to provide indemnification for punitive damage awards when the insured's liability is "vicarious" rather than "direct." Citing Malanga v. Manufacturers Cas. Ins. Co., 28 N.J. 220, 146 A.2d 105 (1958), plaintiffs reason that an employer who is vicariously liable may be indemnified for punitive damage awards, since in that circumstance it does not share in the culpability of the employee-wrongdoer. Plaintiffs argue that under New Jersey law, an employer may be held "directly" liable for punitive damages only in the event of actual participation by upper management or willful indifference. See Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 625, 626 A.2d 445 (1993); see also Winkler v. Hartford Acc. & Indem. Co., 66 N.J. Super. 22, 29, 168 A.2d 418 (App.Div.), certif. denied, 34 N.J. 581, 170 A.2d 544 (1961); Grace M. Giesel, The Knowledge of Insurers and the Posture of the Parties in the Determination of the Insurability of Punitive Damages, 39 Kan.L.Rev. 355, 380 (1991); Restatement (Second) of Torts § 909 (1977). Plaintiffs assert that the distinction between direct and vicarious liability is significant for the purpose of determining whether the punitive damage award should be covered by defendants' policies. They conclude that, since they were *581 vicariously rather than directly liable for punitive damages in both Wooderson and Racer, it would not offend public policy to permit coverage for those awards.
The courts throughout the country are split as to whether the typical general liability or excess policy covers punitive damage awards. See 15A Couch on Insurance 2d, § 56:9 (Rhodes rev. 1983); see also 6B Appleman, Insurance Law & Practice, § 4252 (Buckley rev. 1979) (noting that "public policy does not always dictate that punitive damages be excluded from coverage" and citing cases). Some courts have held that punitive damages are unambiguously covered because carriers agree to pay "all sums" the insured becomes legally obligated to pay as "damages." E.g., American Home Assurance Co. v. Safway Steel Prods. Co., 743 S.W.2d 693, 701-02 (Tex. Ct. App. 1987); Brown v. Maxey, 124 Wis.2d 426, 369 N.W.2d 677, 685-86 (1985). Others have applied the traditional contract ambiguity doctrine and reached the same result. Giesel, supra, 39 Kan.L.Rev. at 384-90; Alan I. Widiss, Liability Insurance Coverage for Punitive Damages? Discerning Answers to the Conundrum Created by Disputes Involving Conflicting Public Policies, Pragmatic Considerations and Political Actions, 39 Vill.L.Rev. 455, 475-76 (1994); e.g., Valley Forge Ins. Co. v. Jefferson, 628 F. Supp. 502, 505-06 (D.Del. 1986); Dayton Hudson Corp. v. American Mutual Liab. Ins. Co., 621 P.2d 1155, 1158 (Okla. 1980).
Another analytical approach embraced by some courts and advanced by plaintiffs here is to determine whether the insureds' liability is direct or vicarious. Giesel, supra, 39 Kan.L.Rev. at 395, 410-11; Widiss, supra, 39 Vill.L.Rev. at 480-84. Some courts conclude that, if the employer's liability for punitive damages is merely vicarious, coverage should be afforded. See U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061, 1064 (Fla. 1983) (concluding that Florida public policy does not preclude insurance coverage for punitive damages when the insured is not personally at fault, but is merely vicariously liable for another's wrong); Beaver v. Country Mut. Ins. Co., 95 Ill. App.3d 1122, 51 Ill.Dec. 500, 503, 420 *582 N.E.2d 1058, 1061 (1981) (noting that, while insuring against punitive damages arising from one's own conduct is against public policy, an employer may insure itself against punitive damages for which it is vicariously liable as a consequence of its employee's wrongful conduct); Dayton Hudson, supra, 621 P.2d at 1160 (same); see also Couch on Insurance, supra, § 56:9 (arguing that the "better position" is that public policy does not permit indemnification for punitive damages directly imposed, but that it does allow insurance coverage for vicarious punitive liability). Plaintiffs argue that the New Jersey Supreme Court adopted this vicarious/direct liability distinction in Malanga, supra, 28 N.J. at 227, 146 A.2d 105.
We reject plaintiffs' argument. First, Malanga is of little benefit to plaintiffs' argument. In Malanga, a partnership was covered by a comprehensive liability insurance policy naming it and the individual partners as insureds. Id. at 223, 146 A.2d 105. Under the policy, the carrier undertook to pay on behalf of the insureds all sums which they became "legally obligated to pay as damages because of bodily injury ... caused by accident." Ibid. "[A]ccident" was defined to include assault and battery "unless committed by or at the direction of the insured." Ibid. The partnership sought coverage for both compensatory and punitive damages arising from the assault and battery of a third person by one of the partners in the course of partnership business. Id. at 225, 146 A.2d 105. The Supreme Court concluded that the partnership was covered because, while the wrongdoing partner was clearly excluded from coverage, it was necessary to "distinguish between an agent who is guilty of willful wrongdoing and his principal [the partnership] who is only vicariously responsible." Id. at 227, 146 A.2d 105. Therefore, "[w]hile an assault and battery is a premeditated act from the agent's point of view, to his passively liable principal and to his victim it is an unforeseen occurrence, i.e., an `accident' within the meaning of the policy." Ibid.
*583 Malanga is not dispositive since the Court was simply applying the well-settled principle that the partnership, as a named insured, must be "recognized by the terms of the policy as an entity distinct from its individual partners." Id. at 228, 146 A.2d 105; see also Property Cas. Co. of MCA v. Conway, 284 N.J. Super. 622, 626-27, 666 A.2d 182, 185 (App.Div. 1995) (concluding that father vicariously liable for son's vandalism under N.J.S.A. 18A:37-3 was covered by liability policy since, from father's perspective, the son's act was unintended and unexpected). Malanga does not purport to address the discrete issue whether, as a matter of law, New Jersey's public policy precludes coverage for punitive damage liability. In fact, the Court noted that the insurer did not raise the distinction between compensatory and punitive damages. Malanga, supra, 28 N.J. at 225, 146 A.2d 105.
Second, New Jersey sides with those jurisdictions which proscribe coverage for punitive damage liability because such a result offends public policy and frustrates the purposes of punitive damage awards.[2] For example, in Variety Farms, Inc. v. New Jersey Mfrs. Ins. Co., 172 N.J. Super. 10, 13, 410 A.2d 696 (App. Div. 1980), the insured corporation and its president sought coverage for a punitive damage award recovered by a minor who suffered a serious injury while employed by the company. We observed that punitive damages are "sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious." Id. at 24, 410 A.2d 696; accord Leimgruber v. Claridge Assocs., 73 N.J. 450, 454, 375 A.2d 652 (1977) (purpose of punitive damage award is the deterrence of egregious misconduct and the punishment of the offender); see also Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337, 627 A.2d 1081 (1993); Fischer v. Johns-Manville Corp., 103 *584 N.J. 643, 657, 512 A.2d 466 (1986). We acknowledged the conflict among other jurisdictions concerning whether it is in the public interest to permit insurance coverage for punitive damages, and considered the "sounder rule to be that public policy does not permit a tortfeasor to shift the burden of punitive damages to his insurer." Variety Farms, supra, 172 N.J. Super. at 24-25, 410 A.2d 696. In so holding, we observed:
The policy considerations in a state where ... punitive damages are awarded for punishment and deterrence[], would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an[] insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages [have] already ... made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong.
[Variety Farms, supra, 172 N.J. Super. at 25, 410 A.2d 696 (quoting Northwestern Nat'l Cas. Co. v. McNulty, 307 F.2d 432, 440 (5th Cir.1962)).]
Loigman v. Massachusetts Bay Ins. Co., 235 N.J. Super. 67, 73, 561 A.2d 642 (App.Div. 1989) (concluding that federal Rule 11 sanctions imposed against attorney-insured "were punitive in nature and uninsurable"); City of Newark v. Hartford Acc. & Indem Co., 134 N.J. Super. 537, 547, 342 A.2d 513 (App.Div. 1975) (noting that public policy "would plainly not permit ... indemnification by the carrier of any claim for punitive damages"); see also Giesel, supra, 39 Kan.L.Rev. at 393-94; Widiss, supra, 39 Vill. L.Rev. at 500.
Notably, Variety Farms, supra, contains no analysis concerning whether or not the policy language is ambiguous, presumably because the issue is irrelevant in view of our overriding public policy precluding coverage for punitive damage awards. Nor does it make the vicarious/direct liability distinction in pronouncing the rule that such coverage would offend public policy. We find no reason to carve an exception to Variety Farm's holding based upon the vicarious/direct dichotomy on the facts before us.
We question whether the vicarious/direct liability distinction should be applied in a product liability case, at least, as here, in the employer-employee setting. Where a punitive damage *585 award arises in such a case, the purpose of the award is to punish the wrongdoer, to deter defendant and others from similar conduct in the future, and "to encourage plaintiffs to pursue a manufacturer who engages in a `deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.'" Fischer, supra, 103 N.J. at 658, 512 A.2d 466 (quoting Berg v. Reaction Motors Div., Thiokol Chem. Corp., 37 N.J. 396, 414, 181 A.2d 487 (1962)). Punitive damages "serve the public interest by encouraging corporations to keep defective products ... out of the marketplace." Widiss, supra, 39 Vill.L.Rev. at 500-01. Permitting a shift of the responsibility for punitive damages from the manufacturer to its insurance company in a product liability case would thwart those purposes. Id. at 499.
Responsibility for the design or manufacture of faulty products appropriately rests with the executives of an enterprise. Therefore, the public's interest in safe products mitigates against anything that serves to diminish the responsibilities of those charged with making executive decisions about product safety. Consequently, the substantial societal interest in assuring that defective products  especially items which pose threats to the health and safety of the public  do not enter the marketplace means that it would be very undesirable to apply the vicarious liability exception in this context.
[Ibid.]
In Fischer, supra, the Supreme Court addressed these public policy considerations in a different factual setting. There the manufacturer argued that it should not be held liable for punitive damages because the culpable employee may no longer be employed by it. Fischer, supra, 103 N.J. at 662, 512 A.2d 466. The Court rejected the contention because it "ignores the nature of a corporation as a separate legal entity." Ibid. The Court reasoned that "[a]lthough the responsible management personnel may escape punishment, the corporation itself will not" (emphasis added), and stressed that:
[A] primary goal of punitive damages is general deterrence  that is, the deterrence of others from engaging in similar conduct. See Mallor and Roberts, [Punitive Damages: Toward a Principled Approach, 31 Hastings L.J. 639, 648-49 (1980)]. That purpose is, of course, well served regardless of changes in personnel within the offending corporation.

*586 [Fischer, supra, 103 N.J. at 662, 512 A.2d 466.]
Fischer's reasoning is instructive here. Just as we should not focus on the fact that the employee-wrongdoer has departed in judging the deterrent value of punitive damage awards against the employer, we should not necessarily decide whether or not to allow indemnity for those awards based on the management level of the employee who committed the wrongful act. Whether the product enters the marketplace as a result of executive policies or lower-level employee wrongdoing, the potentially devastating consequences to consumers are the same. It is therefore necessary to punish "the corporation itself," ibid, and to deter the corporation and others from engaging in similar conduct in the future. Permitting the corporation to seek refuge by shifting the cost of punitive damage awards to insurance carriers based on vicarious liability would still frustrate those goals.
In any event, we are able to decide this case without applying the vicarious/direct distinction since there was no finding that J & J or Ortho was held vicariously rather than directly liable for the punitive damages in either Wooderson or Racer. As we read those opinions, the issue of vicarious versus direct liability was raised neither in the pleadings nor during trial, nor was it charged to the jury. No individual officer or employee was named as a defendant in either case. Most importantly, no claim was made in either case that the manufacturer was not liable for punitive damages because of the vicarious/direct liability distinction.
Punitive damages were awarded against Ortho in Wooderson because of its wanton failure, as a manufacturer, to place a reasonably safe product in the marketplace. The court in Wooderson noted that, "[a]pparently [Ortho's] competitive position in the market was better served by continuing the manufacture and sale of its ... product," rather than heeding "the accumulating medical and scientific evidence" that its product was extremely dangerous. The court also noted that there was evidence from which the jury could conclude that Ortho, as a manufacturer, failed to pursue additional research and "played down the danger *587 of" its product despite its knowledge of the product's dangerous propensities. Wooderson, supra, 681 P.2d at 1063-64.
Similarly, in Racer, the court observed that, from the evidence, the jury could have concluded that J & J as a corporate entity had placed the flammable drape in commerce "knowing and intending that it be used for surgery where a cautery would be in use" with knowledge of its flammability and "indifference to, or conscious disregard for, the safety of others." Racer, supra, 629 S.W.2d at 396. With this knowledge, J & J represented in its marketing activities that the product was safe for these operations and "that the drape met governmental flammability standards which were in fact non-existent." Ibid. Nothing in either of the Wooderson or Racer opinions suggests that low-level employees were responsible for the egregious conduct justifying the punitive damage awards. To the contrary, the entirety of both opinions implies culpability based upon upper-management decision making, if not corporate policy established by executive personnel.
Plaintiffs argue, alternatively, that it would not be against New Jersey's public policy to permit insurance indemnification against punitive damage awards for "unintentional conduct" that is a "species" of negligence or gross negligence. They contend that coverage should be allowed under such circumstances "because traditional concerns about wrongdoers shifting their losses to insurers lose their force when the type of conduct supporting an award of punitive damages is no greater than gross negligence." Plaintiffs state that, since the Wooderson and Racer punitive damage awards were based on "unintentional" conduct, affording coverage for those awards would not offend New Jersey's public policy.
However, as stated, the law as to punitive damages in Kansas, as applied by the Wooderson court, required a showing of a malicious, vindictive, or willful and wanton invasion of the injured party's rights. Wooderson, supra, 681 P.2d at 1061. Similarly, in Racer, the Missouri Court of Appeals required a finding of knowledge of the dangerous propensity of the product and an "indifference *588 to, or conscious disregard for, the safety of others sufficient to support a punitive damage award." Racer, supra, 629 S.W.2d at 396-97; see also Kansas City v. Keene Corp., 855 S.W.2d 360, 374 (Mo. 1993) ("Punitive damages may be awarded only where the defendant knew of the defect and danger of the product and ... showed complete indifference to or conscious disregard for the safety of others."). Neither standard articulates a "species" of negligence.
Plaintiffs' contention that the Wooderson and Racer plaintiffs would not have recovered punitive damages in New Jersey is sheer speculation. New Jersey's Products Liability Act provides:
Punitive damages may be awarded to the claimant only if the claimant proves, by a preponderance of the evidence, that the harm suffered was the result of the product manufacturer's or seller's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product. For the purposes of this section "actual malice" means an intentional wrongdoing in the sense of an evil-minded act, and "wanton and willful disregard" means a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such action or omission. Punitive damages shall not be awarded in the absence of an award of compensatory damages.
[N.J.S.A. 2A:58C-5a.]
See also Fischer, supra, 103 N.J. at 670-71, 512 A.2d 466; Berg, supra, 37 N.J. at 414, 181 A.2d 487.
Based on the conduct of both Ortho and J & J as above-described, we are firmly of the view that the facts in both Wooderson and Racer would have permitted a jury, applying New Jersey law, to conclude by a preponderance of the evidence that the harm suffered was a result of plaintiffs' acts or omissions "accompanied by a wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product"; that is, that plaintiffs committed "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such action or omission." N.J.S.A. 2A:58C-5a.
*589 In our view, the legal standards imposed for the awards of punitive damages in both Wooderson and Racer are not so conceptually different from New Jersey's standard as to cause us to abandon our State's well-settled policy which precludes insurance coverage for punitive damage liability.[3]
Affirmed.
NOTES
[1] No choice-of-law issue is raised here. See Gilbert Spruance Co. v. Pennsylvania Mfrs.' Ass'n Ins. Co., 134 N.J. 96, 111-12, 629 A.2d 885 (1993). Plaintiffs and all defendants agree that New Jersey law applies in resolving the coverage question. In any event, at the time plaintiffs' claim for coverage arose, Kansas' and Missouri's public policy precluding coverage for punitive damage awards was in harmony with ours. See St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc., 245 Kan. 258, 777 P.2d 1259, 1270 (1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); Crull v. Gleb, 382 S.W.2d 17, 23 (Mo. Ct. App. 1964). Therefore, there is no need to analyze the interests of the respective jurisdictions for choice-of-law purposes. See Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986); Grossman v. Club Med Sales, Inc., 273 N.J. Super. 42, 49, 640 A.2d 1194 (App.Div. 1994).
[2] Presently, there exists no legislation in our State either prohibiting or permitting coverage for punitive damage awards. However, substantially similar bills, A-3060 and S-2266, are presently pending in both houses of the State Legislature which would authorize indemnity coverage for punitive damage awards.
[3] We do not address whether a different result could be reached if the punitive damage award was entered in a jurisdiction having a significantly lower standard than that required by our Products Liability Act.