735 A.2d 1203 (1997)
324 N.J. Super. 476
FILENET CORP., Plaintiff,
v.
CHUBB CORP. et al., Defendant.
Superior Court of New Jersey, Law Division, Somerset County.
Decided December 19, 1997.
*1205 Earl M. Bennett, Herold & Haines, Princeton, for Plaintiff.
Marilyn Silvia, Hill Wallack, Princeton, for Defendant.
*1204 HELEN E. HOENS, J.S.C.
Before the Court are the parties' cross-motions for summary judgment. For the reasons which follow, the plaintiff's motion is denied and the defendants' motion is granted. This matter is a declaratory judgment action in which plaintiff FileNet seeks a declaration that defendant insurers Chubb Group of Insurance Companies, Vigilant Insurance Company, Federal Insurance Company and Pacific Indemnity Company (collectively "defendants") owe it a duty to defend it and ultimately to indemnify it for any losses plaintiff may sustain in an action against it by Wang Laboratories, now pending in Federal Court in Boston. Secondarily, plaintiff seeks damages from defendants based upon a theory of bad faith arising from defendants' denial of any obligation to provide a defense or to indemnify FileNet. As many of the issues raised in these motions are previously unaddressed in New Jersey, an explanation of the underlying litigation and the coverages pursuant to which defense and indemnification are sought is required.
The Wang litigation is based upon a six count complaint in which Wang alleges that FileNet, with respect to six specified Wang patents:
"has without authority made, sold, or used, and continues to make, sell, or use, products that infringe or contributorily infringe the ... patent, or has actively induced and continues to actively induce infringement of the ... patent."
In this action, FileNet seeks coverage from defendants pursuant to both primary Comprehensive General Liability (CGL) policies and excess policies issued for various time frames for the period April 11, 1985 through April 11, 1992. In general, each of these policies includes coverage for "advertising injury" and for "personal injury" but the definitions of these terms vary somewhat from one policy to another.
The primary CGL policies in effect from April 11, 1985 through April 11, 1987 defined "advertising injury" and "personal injury" in relevant part only as follows:
ADVERTISING INJURY
means injury arising out of one or more of the following offenses committed during the policy period occurring in the course of your advertising activities:
1. libel, slander, defamation, violation of right of privacy; or
2. infringement of copyright, title, slogan, trademark, service mark or trade name; or
3. unfair competition or piracy.
PERSONAL INJURY
means injury arising out of one or more of the following offenses committed during the policy period ...
4. publication or utterance of a libel, slander or other defamatory or disparaging material; ...
The primary CGL policies issued to FileNet from April, 1987 through April, 1992 contained the following modified definitions:
ADVERTISING INJURY
means injury arising solely out of one or more of the following offenses committed *1206 in the course of advertising your goods, products or services:
1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
2. misappropriation of advertising ideas or style of doing business; or
...
4. infringement of copyrighted advertising materials, titles or slogans.
PERSONAL INJURY
means injury, other than bodily injury, arising out of one or more of the following offenses committed in the course of your business, other than your advertising activities ...
4. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services ...
Effective August 26, 1992, Endorsement No. 7 to the primary CGL policies deleted the above underlined language from the relevant definitions and changed the definition of "advertising" to include "any paid advertisement, public article, broadcast or telecast". The excess/umbrella policies issued throughout these various time periods define "advertising injury" and "personal injury" without any material differences from the definitions found in the underlying primary policies as quoted here.
Among the disputes raised and addressed by the parties in their voluminous briefs and appendices are (1) choice of law; (2) competency of extrinsic evidence; (3) principles governing the duty to defend analysis in general; (4) interpretation of virtually every term in the policy language defining advertising injuries, personal injuries and the phrase "arising out of" in the context of the indemnity dispute. We address each of these issues in turn.
1. Choice of Law
Defendants urge the Court to apply the law of California to the issues in dispute, contending that FileNet is headquartered there and that the policies were issued, procured and paid for there through California brokers and FileNet personnel. Plaintiff argues that the law of New Jersey should apply, arguing that defendants are actually New Jersey based companies which underwrite and issue their policies here and which have declined to cover these claims by so deciding here in New Jersey. Each side contests the accuracy of some or all of the facts relating to the conflicts analysis on which the other party relies.
The first step in any conflict of laws analysis is to determine whether any conflict exists between the applicable laws of the interested states. Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986). In undertaking this analysis, questions of conflicts are determined on an issue-by-issue basis. Id. If, after comparing the relevant law, it is determined that an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and to evaluate how those policies are affected by each state's contacts to the litigation and to the parties.
When resolving conflicts-of-law issues in the liability insurance context, New Jersey has rejected the traditional lex loci contractus or place where the contract was entered into rule and instead has adopted the more flexible governmental interest analysis, which focuses on a determination about which state has the most significant connections with the litigation and the parties. Gilbert Spruance v. Pennsylvania Mfrs., 134 N.J. 96, 102, 629 A.2d 885 (1993), citing State Farm Mutual Automobile Insurance Co. v. Estate of Simmons, 84 N.J. 28, 417 A.2d 488 (1980). In this regard, our Supreme Court held in State Farm that because the law of the place of the contract "generally comports with the reasonable expectations of the parties concerning the principal situs of the insured *1207 risk", that forum's law should apply unless the dominant and significant relationship of another state to the parties and to the underlying issue dictates that this basic rule should yield. State Farm Mutual Automobile Ins. Co. v. Estate of Simmons, supra, 84 N.J. at 37, 417 A.2d 488. However, the Court, in refining the governmental interest analysis in that opinion, directed trial courts to rely on an evaluation of the factors and contacts described in the Restatement (Second) of Conflicts of Laws, § 6, 188 in performing its analysis.
The general rule in contract actions, as set forth in Section 188 of the Restatement (Second) is that the law of the state with the most significant relationship to the parties and transaction under the principles set out in section 6 of the Restatement (Second) governs. Id. Relevant contacts for the purpose of this analysis include domicile, residence, place of incorporation and place of business of the parties, and the place of contracting and performance. General considerations set forth in Section 6 and pertinent to a Court's conflict-of-law analysis are:
(a) the needs of the interstate and international system; (b) the relevant policies of the forum; (c) the relevant policies of other affected states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied.
Moreover, our Supreme Court has further pointed out that while Restatement § 188 sets forth a choice-of-law rule for contracts in general, section 193 provides guidance specifically applicable to insurance contracts, including the types of CGL and excess policies in issue here, holding that in this particular context:
the court should apply the law of the state that the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and to the parties.
Gilbert Spruance v. Pennsylvania Mfrs., supra, 134 N.J. at 103, 629 A.2d 885. In cases where the insured risk is an activity or operation which is predictably multistate, therefore, the governing law is that of the state with the dominant significant relationship according to the principles set forth in § 6. Id. at 112, 629 A.2d 885. The issues before this Court are the interpretation of the applicable clauses of the several insurance policies and more specifically whether those policies require the insurers to defend and indemnify the insured in the underlying patent infringement action under the provisions providing coverage for "advertising injury" or "personal injury".
On the issue of interpretation of the insurance contract, New Jersey and California law are not in conflict. Whether an insured has a duty to defend is determined by comparing the allegations in the underlying complaint with the language of the policy. Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173, 607 A.2d 1255 (1992). Both New Jersey and California determine this duty by looking not only to the allegations of the complaint but also to relevant facts extrinsic to the complaint. SL Industries v. American Motorists, 128 N.J. 188, 198-99, 607 A.2d 1266 (1992); Montrose Chem. Corp. v. Superior Court, 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153, 1159 (1993). As our own Supreme Court has held, "insureds expect their coverage and defense benefits to be determined by the nature of the claim against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured." SL Industries v. American Motorists, supra, 128 N.J. at 198-99, 607 A.2d 1266. Therefore, as it respects our analysis of the duty to defend, it is plain that the application of either New Jersey law or California law *1208 will yield the same result. As to the issue of whether coverage in the sense of an ultimate duty to indemnify exists, there are no reported New Jersey cases interpreting "advertising injury" coverage in the context of an underlying patent infringement suit. By far, the most cases dealing with this precise issue come from California State and Federal Courts. Therefore, while there is in a technical sense no conflict of law, and although not binding upon this Court's determination, we look to all of these opinions for guidance.
2. Evaluation of the Wang-FileNet dispute
A crucial first step in deciding the coverage dispute is an analysis of the underlying litigation for which coverage and defense are demanded. In this regard, defendants argue that the sole focus of this evaluation is and must be limited to the wording the Wang complaint itself. They contend that the pleading on its face sounds in patent infringement alone, an argument central to their dispositive motion. Defendants argue that plaintiff's arguments to the contrary are neither properly supported by competent evidence nor borne out by the evidence submitted regardless of its actual evidential value. Thus, they urge the Court to evaluate both the duty to defend and the duty to indemnify in terms of a simple underlying patent infringement claim. Plaintiff argues that the actual claims being made by Wang are broader than the four corners of the pleading it filed and encompass claims which can more generally be referred to as unfair competition claims. Moreover, plaintiff contends that, because Wang could, consistent with the state of the record in that litigation, amend its complaint to assert indisputably covered claims, defendants cannot be relieved of their duty to defend. Finally, plaintiff argues that if the duty to defend arises with respect to any potentially covered claim, the claim for indemnification of necessity cannot be dismissed.
This aspect of the dispute is significant, for it directly impacts on the broader, but more technical, coverage analysis. Indeed, the characterization of the Wang dispute, at least in the view of plaintiff is the true determinant for coverage purposes. While defendants do not concede that this analysis alone resolves the coverage question, they agree that it is central to plaintiff's claim. And, as a result, the issue of whether we limit the analysis of the Wang dispute to the precise pleading or evaluate the dispute more broadly becomes an important first step in deciding the coverage question.
Defendants argue that the only claim pleaded by Wang is patent infringement and that all of plaintiff's suggestions concerning what Wang's pleading might have claimed or how the evidence revealed in discovery in that matter might be characterized are neither competent evidence nor relevant to the coverage issue. Plaintiff argues, in opposition, that the Court should look not simply to the underlying pleadings but more generally to the discovery which has been and is still being conducted in the Wang action and should evaluate not only the current claims and allegations but all other claims which might be supported by the discovery had to date, recognizing that the pleadings might be modified in the future in conformance with the proofs.
The Wang litigation centers on that entity's claims that FileNet induced its customers to use FileNet products in a configuration which infringed Wang's patented products. The pleading itself is characterized in terms of FileNet "actively inducing" its customers (or potential customers) to undertake actions and uses of FileNet products which constitute infringement of Wang patents. Simply read, that pleading states only a claim for patent infringement, and not any other claim, including any other unfair competition claim of any kind. On its very face, the only claim and the plain focus of the Wang *1209 complaint is its allegation that FileNet's activities have themselves infringed Wang patents or have induced or importuned others to do so. Thus, if we look solely to the language chosen by Wang to form its articulation of the essence of its claim, we would be constrained to analyze the duty to defend and to indemnify only in terms of strict patent infringement.
Plaintiff contends that we should not look solely to the allegations of the complaint but that we should evaluate the evidence adduced in the underlying litigation for the purpose of deciding whether those facts might support a recovery based upon claims relating to a covered, but not as yet pleaded, theory. They point to much evidence on which they contend Wang might argue in favor of a recovery sounding in unfair competition, infringement of trade dress or, potentially, common law passing off. In opposition, defendants first contend that as a matter of law, there can be no claim on any theory other than patent infringement, an argument which rests on a theory of federal preemption. Alternatively, they argue that none of the evidence in the Wang dispute supports any other common law theory even if not pre-empted. We reject outright defendants' suggestion that the patent laws and remedies are so broadly pre-emptive. Clearly, in theory, there could be many claims other than pure patent infringement which could be raised in the appropriate case, and we disagree with defendants' suggestion that the common-law claims which are related to the true patent infringement claims are all preempted. See Balboa Ins. Co. v. Trans Global Equities, 218 Cal.App.3d 1327, 267 Cal.Rptr. 787 (1990), cert. denied sub nom Collateral Protection Ins. Serv. v. Balboa Ins., 498 U.S. 940, 111 S.Ct. 347, 112 L.Ed.2d 311 (1990). Notwithstanding that, the mere theoretical possibility that other claims might exist in conjunction with true patent claims does not end our inquiry.
First, regardless of whether Wang might in the future seek to amend its complaint to assert such common law theories, it has not done so and, significantly, has not attempted to do so during the extended period of time while this motion was being briefed and has been pending. Thus, as a practical matter, the likelihood that Wang will suddenly seek to expand its theory of recovery beyond the rather straightforward patent infringement claim and into the far more esoteric and fluid realm of such common law theories as trade dress infringement or passing off is remote. Plaintiff's suggestion that we should read the Wang claims broadly and indulgently is, in actuality, an effort to have this Court at a minimum, require defendants to defend plaintiff in the Wang litigation as a part of their "potentially covered" loss argument. While more properly analyzed (and more completely addressed infra) as part of the issue of the breadth of the duty to defend, plaintiff's argument regarding potentiality of coverage also impacts on our analysis of the Wang complaint. Part of plaintiff's approach in this regard is its argument that the Court must read the Wang complaint broadly and must weigh the extrinsic evidence indulgently in order to properly evaluate defendants' duty to defend. In this regard, the suggestion that defendants must defend the Wang suit because of the mere possibility of coverage for an as yet unpleaded theory and, more important, the suggestion that defendants' failure to voluntarily undertake the defense under such attenuated circumstances constitutes actionable bad faith is novel at best. Indeed, while the duty to defend in fact is broader than the duty to indemnify, see Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173-74, 607 A.2d 1255 (1992), adopting plaintiff's analysis here would virtually nullify any limitation on the duty in plain contravention of the contract's terms.
Thus, while we look more closely at the Wang allegations to determine whether they in fact include any which might arguably give rise to coverage, we do so more narrowly than plaintiff suggests.
*1210 We recognize that a complaint may be relatively narrowly drawn, that discovery may reveal alternate, unpleaded theories, that broadly viewed those theories could give rise to coverage as a result of which there might be a duty to defend, but our analysis does not permit nor does it require that we make a better case or a broader claim than those which might fairly be said to arise from the evidence. To do so we think would create a nearly unlimited duty to defend and would unfairly require insurers to advance a defense based upon remote possibilities bordering on speculation. Indeed to do so would be to expose insurers unfairly to virtually unfettered claims of bad faith and would deprive them of the benefit relating to scope of coverage that they bargained for. Thus, while we analyze the Wang dispute rather broadly, we do not agree with plaintiff's far more expansive claims as to its essential focus.
The essence of the Wang litigation stems from the fact that Wang created and patented a file serving system. FileNet does not make, sell or distribute such a system, but allegedly included in its advertisements suggestions for reconfiguring FileNet products so as to operate in a manner like the Wang patented system. Based in part upon these advertisements, Wang charges FileNet with infringing its patent or inducing others to do so through its marketing efforts. Here, as a part of its effort to secure a defense and coverage under defendants' policies, FileNet contends first that these specific claims sounding in patent infringement are covered but second, that even if the policies do not provide coverage for pure patent infringement, there is coverage nonetheless because Wang is actually charging FileNet with unfair competition by means of trademark or trade dress infringement or common law passing off. We disagree. Even the broadest analysis of the facts discovered to date would not support a claim sounding in trademark or trade dress infringement or common law passing off. Obviously, there is and can be no trademark or trade dress claim raised in the Wang litigation. Wang's products are patented ones, not ones protected by a trademark. A claim resting on trademark infringement might co-exist with a strict patent claim, but would, of necessity, include the requisite elements of trademark infringement. These elements include the existence of an identifying mark, both distinctive and capable of being protected. See, e.g. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). There is no basis in any of the evidence before this Court to conclude that such a claim might be made or could be made by Wang because there is no identifying mark.
Similarly, the related theories of trade dress infringement or common law passing off require demonstration of essentially fraudulent or wrongful marketing of one's goods as those of another or marketing of goods with an unprivileged imitation of the physical appearance of the product of another. SK&F Co. v. Premo Pharmaceutical Laboratories, 625 F.2d 1055, 1062 (3rd Cir.1980); see Squeezit Corp. v. Plastic Dispensers, Inc., 31 N.J.Super. 217, 221-22, 106 A.2d 322 (App.Div.1954). The essence of each of these causes of action is creating the appearance that one's product is that of another through express or implied means. The analysis of these theories in the context of this case is significant, for Wang does not contend that FileNet made a product which physically looked like Wang's packaging or visually appeared to be Wang's product. Nor could Wang fairly make such a claim based on the evidence. Because the very essence of trade dress infringement and common law passing off is the confusion arising out of physical appearance, see SK&F Co. v. Premo Pharmaceutical, supra, 625 F.2d at 1062 (color combination of generic drug capsules intended to mimic protected drug product); Squeezit Corp. v. Plastic Dispensers, Inc., supra, 31 N.J.Super. at 221-22, 106 A.2d 322 (catsup dispensers in *1211 tomato shapes were confusingly like distinctive shape and color of original), Wang could not raise nor could it support such a claim against FileNet. We decline to hold that the allegations of the Wang complaint or any of the evidence there adduced states a claim pursuant to one of these common law torts, however, for another reason as well. Fundamental to the passing off analysis is the concept of non-functionality of the aspect copied. American Home Products v. Barr Laboratories, 656 F.Supp. 1058, 1061 (D.N.J.1987). There can be no serious doubt but that the elements of the Wang products which FileNet is accused of copying were the every essence of the functioning of the products. And as a result, the allegedly copied elements cannot under any circumstances be seen as nonfunctional and the complaint which rests upon functions allegedly copied cannot fall within the common law torts as to which there might be coverage under the policy language.
Based upon the foregoing analysis, in this case, there is no ground upon which to conclude that Wang has made or could make any common law claims or even non-patent based claims against FileNet. Rather, its pleadings and all of the proceedings to date in that litigation are based upon and give rise to a theory of patent infringement alone. While it is true in the abstract that Wang could attempt to amend its pleadings in the future, its failure to assert any non-patent claim to date, and the technicalities of the proofs required for the common law claims makes the likelihood of such an eventuality in the foreseeable future extremely remote.
Thus, based upon our analysis of the Wang-FileNet litigation, we find only a patent infringement claim. We recognize that the duty to defend is broader than the duty to indemnify, for the focus on allegations requires a broader analysis of the pleadings and, more important, requires that we put aside any question of likelihood of success on the merits of any particular claim. Thus, in an abundance of caution respecting our analysis of these claims in this litigation, we will regard the underlying Wang-FileNet dispute more broadly than the patent infringement claims there alleged and will analyze the duties to defend and indemnify as well in the context of the somewhat more expansive view of the allegations urged upon us by FileNet here.
3. Duty to Defend
Plaintiff argues that under New Jersey law, the duty to defend arises if the allegations of the underlying dispute state a claim as to which coverage potentially applies, see N.L. Industries v. Commercial Union Ins., 828 F.Supp. 1154, 1161 (D.N.J. 1993) or if there are facts uncovered in discovery which bring the case within the scope of coverage, see SL Industries v. Amer. Motorists Ins., 128 N.J. 188, 198-99, 607 A.2d 1266 (1992). Moreover, plaintiff contends that any dispute regarding the duty to defend must be decided in favor of coverage, see Broadwell Realty v. Fidelity & Casualty, 218 N.J.Super. 516, 524, 528 A.2d 76 (1987) and that the insurer has the burden of demonstrating that coverage does not exist, see Vantage Development Corp. v. American Environment Technologies Corp., 251 N.J.Super. 516, 524, 598 A.2d 948 (Law Div.1991). Finally, they contend that defendants' motion for summary judgment on this issue cannot be granted because genuine issues of material fact exist regarding the Wang dispute which dispute in and of itself operates in this context to preclude granting of defendants' dispositive motion. See Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995).
Defendants first argue that California law applies to the duty to defend analysis, but that in the alternative, even if New Jersey law applies, plaintiff's arguments must be rejected. Defendants argue that the decision is essentially one of contract interpretation and that the existence of the duty is determined based upon a review of the allegations of the complaint. Grand *1212 Cove II Condo Assoc. Inc. v. Ginsberg, 291 N.J.Super. 58, 71, 676 A.2d 1123 (App.Div. 1996). They argue that no reading of the complaint can support a finding that there is a duty to defend because none of the allegations suggests even a potentially covered claim.
We first address the summary judgment standard raised by plaintiff as part of its opposition to defendants' motion, for that standard governs our analysis of both motions here. Notwithstanding plaintiff's interesting citation of cases regarding the appropriate test to be applied in deciding motions for summary judgment, the proper test is plainly set forth in Brill v. Guardian Life Ins. Co., supra, 142 N.J. 520, 666 A.2d 146 (1995). There, the Supreme Court held that in addressing the question of whether or not there is a genuine issue of material fact which will preclude the Court from granting the motion, the Court is required to evaluate whether the evidence, even if disputed, is so one-sided that were a jury to find for the opponent of the motion, the verdict could not be sustained. Id. at 540, 666 A.2d 146, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, in order to defeat a motion for summary judgment, there must be a dispute of fact which in this sense is both genuine and material to the eventual outcome. Applying this standard to this case, we decline to accept plaintiff's suggestion that uncertainty as to the eventual outcome of the underlying Wang dispute automatically precludes summary judgment in this coverage action. Were we to adopt that approach, no insurer could ever decline to defend and no Court could ever resolve coverage disputes in advance of trial because the underlying issues relating to coverage would be unresolved. Rather, in this case it is clear that the essential facts on which this dispute rests are themselves not in dispute. The existence of a dispute concerning the application of the law to those facts does not preclude summary judgment. Nor is there any doubt about the law in this state regarding duty of an insurer to defend. The duty, while broader than the duty to indemnify, is not without limits. It is based, at its heart, upon fundamental concepts of contract construction as it relates to the elements of any of the causes of action enumerated in the coverage sections of the policies of insurance because the duty to defend springs from the terms and conditions of the contract of insurance itself.
As a result, the first step in the analysis is to compare the coverages in the contract with the allegations of the underlying complaint and to determine whether there appears to be a claim which, if successful could give rise to coverage, which is to say could give rise to a duty to indemnify. Grand Cove II Condo Assoc. Inc. v. Ginsberg, supra, 291 N.J.Super. at 71, 676 A.2d 1123; see Voorhees v. Preferred Mut. Ins. Co., supra, 128 N.J. at 173, 607 A.2d 1255. While in this case we have gone further and have analyzed the underlying Wang complaint rather more indulgently, here the analysis is the same, for we have concluded that the essential and indeed the only available claim is for patent infringement, and not for any other common law business tort. In this regard, we note in passing that FileNet is incorrect when it argues that where coverage might obtain but where the final analysis is unresolved, that the insurer has a broader duty to investigate the possible outcomes of the underlying case as a part of making its decision on the issue of providing a defense. Indeed, as our Supreme Court has held, the insurer has no affirmative duty to investigate all of the potential ramifications of the underlying suit in an effort to find a possible trigger for coverage. SL Indus. Inc. v. American Motorists, supra, 128 N.J. at 199, 607 A.2d 1266. Nor do we agree with FileNet's argument that the burden is on the insurer to affirmatively prove that there is no coverage in this context. While it is certainly true that our Appellate Division has recently reiterated that an insurer which seeks to disclaim *1213 either coverage or a duty to defend based upon a policy exclusion bears the burden of proof, see Robert W. Hayman, Inc. v. Acme, 303 N.J.Super. 355, 357, 696 A.2d 1125 (App.Div.1997), that analysis does not shift the burden to the insurer where coverage alone is in dispute. Rather, where the dispute revolves around the coverages in the policy, the burden remains on the party seeking to impose the duty to defend. Moreover, while the duty to defend plainly extends to cases in which one theory of the complaint if successful would trigger coverage while alternate theories would not and while in such a case the duty to defend will continue as long as any theory which would result in coverage remains viable, see id. at 358, 696 A.2d 1125, citing Salem Group v. Oliver, 128 N.J. 1, 5-6, 607 A.2d 138 (1992), here we do not face nor need we address such a "concurrent cause" circumstance. Rather our analysis must rest on whether any coverage is available under any theory for the only claim in the Wang litigation, namely patent infringement, for that analysis governs our decision as it relates to the duty to defend. We turn now to that inquiry.
4. Interpretation of coverages
FileNet's argument respecting the coverages themselves proceeds on several levels, as a result of which our analysis must proceed in several parts. First, plaintiff contends that the language defining the offenses covered itself provides coverage or potential coverage for the Wang claims. Second, plaintiff contends that to the extent that the offenses are not themselves broad enough to provide clear coverage, the inclusion of the "arising out of" clause, in accordance with recent guidance from the Appellate Division, broadens the available coverage sufficiently to include the claims asserted against FileNet in the Wang complaint. Third, FileNet contends that the language of some of the clauses in the policies is inherently ambiguous which itself requires that the Court construe the language liberally in favor of the insured and conclude as a result that the claims are in fact covered. Defendants oppose all of these arguments, contending that the offenses are defined so as to provide no coverage for the patent infringement claim in the Wang litigation, that the "arising out of" language does not and cannot serve to broaden coverage nor to, in effect, add coverage for claims not included in the policy language, that in actuality the "arising out of" language is a separate limiting requirement which may serve to reduce or avoid coverage in an appropriate case, and that there is no ambiguity in the language of the policies which can serve to expand the coverage to include the issues raised in the Wang litigation. We address each of these arguments in turn.
We began our analysis by observing that the policy language itself presents a certain inescapable logic which must guide our review. The definition sections for advertising injury and for personal injury contain several elements, each of which must exist in order for there to be coverage or a duty to defend. Thus, each definition section contains certain so-called "offenses" which are listed and each requires a demonstration of links between the offense and the alleged injury. Moreover, as it relates to advertising injury, the offenses must also be linked to advertising. The phrasing which defines coverage is significant, for unless all of the elements and all of the linkages are demonstrated there can be no coverage. As a result, our analysis must focus individually on each of these elements and on the interrelationships between each in order to correctly interpret the policy and, by extension, in order to determine the result as it relates to the cross-motions before the Court.
We begin then with an analysis of the specific offenses as to which each of the policies offers coverage in order to determine whether the activities with which FileNet has been charged by Wang fall within any of the enunciated offenses. Turning first to the definition of advertising injury, the listed offenses include "libel, *1214 slander, defamation, violation of right of privacy". Each of the offenses included in this subgroup rather plainly falls within a related group of torts. Thus, if one's advertising included statements amounting to libel or defamation, coverage would unquestionably exist because all of the elements required for coverage are demonstrated, namely, an injury which arises out of a specified offense committed in the course of advertising. Similarly, the second subgroup of offenses, namely, "infringement of copyright, title, slogan, trademark, service mark or trade name", refers to separate and distinct causes of action, but each of which includes clear and unambiguous elements. To the extent that the insured is charged with committing any of these acts, then, again, there would clearly be coverage if the act alleged occurred in the course of advertising activities and gave rise to an injury. There is no serious contention in this case that the underlying offense with which Wang has charged FileNet falls within any of these groups of offenses. Regardless of how broadly one interprets the allegations contained in the Wang complaint or the evidence adduced in that matter to date, those allegations do not state nor purport to state the requisite elements of any of the causes of action enumerated in either of these sections.
Turning then to the final category, there would be coverage if the acts alleged in the Wang complaint constitute "unfair competition or piracy" in the course of FileNet's advertising. Thus, if it can be said that a claim is raised by Wang which is in the nature of unfair competition or piracy, regardless of whether it is denominated as a patent infringement claim, then coverage and, by extension, a defense are available to FileNet. Confounding our analysis, however, is the fact that this term of the policy was altered during the time period in question, as a result of which we must separately analyze the effect of the changes in the coverage language against the overall issue of coverage and the specifics of the Wang complaint. The earlier primary CGL policy included among the covered offenses the language "unfair competition and piracy" while the later primary policy included in the place of that language the terms "misappropriation of advertising ideas or style of doing business". We first address whether either formulation includes patent infringement claims.
With regard to the earlier language, defendants argue that nothing in those terms, taken in the context of the coverage language in general can be seen to afford coverage for the patent infringement claim raised by Wang. They cite a variety of opinions in support of the proposition that the quoted language offers coverage only for common law unfair competition claims which by definition do not include patent infringement claims. They cite in this regard Bank of the West v. Superior Court, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (Cal.1992); Aetna Cas. & Sur. Co. v. Superior Court, 19 Cal.App. 4th 320, 327-28, 23 Cal.Rptr.2d 442, 446 (Cal.App.4th Dist.1993); Repeat-O-Type Stencil Mfg. Corp. v. St. Paul Fire & Marine Ins., unpublished slip op. at 11 (D.N.J.1/31/96); Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 35 Mass.App.Ct. 239, 244, 618 N.E.2d 1365, 1368 (Mass.App.1993). In addition, relying on the language of the District Court in Atlantic Mutual Ins. Co. v. Brotech Corp., 857 F.Supp. 423, 428 (E.D.Pa.1994), aff'd, 60 F.3d 813 (3d Cir. 1995), the defendants point out that the context in which the term unfair competition is used is one in which a variety of essentially common law torts are delineated, but which are delineated specifically. In light of that context, they argue that the term in that section of the policy simply cannot fairly be interpreted to include by extension a patent infringement claim. Thus, defendants contend that no fair reading of the earlier policy's language (unfair competition or piracy) can be said to cover this claim.
*1215 In response to this analysis, plaintiff contends that the term unfair competition itself includes the very acts alleged by Wang because it necessarily includes common law passing off. Citing the very same opinions on which defendants have relied, FileNet contends that the coverage is clear. In its analysis, FileNet urges the Court to find that, even in the absence of any reference in the policy to "patent infringement" as a covered offense, that the overall intent of the policy is to provide coverage for advertising injuries broadly. As a result plaintiff argues, if the underlying action alleges any injury related to or arising out of FileNet's advertising, then coverage exists or arguably exists such that a duty to defend attaches. In support of this proposition, FileNet, like defendants, cites the Bank of the West decision, urging the Court to rely upon it to reach the opposite conclusion urged upon us by defendants.
We have already determined that the Wang complaint does not now and cannot fairly be said to raise any cognizable common law unfair competition claim. Nor are we persuaded by plaintiff's suggestion that either for purposes of analyzing the duty to defend or the duty to indemnify, there is any ground upon which to conclude that the policy should be read to provide coverage for any injury relating in some way to one's advertising. Applying, as we must, ordinary principles of contract construction precludes such an expansive reading of the policy's coverage. We address then the question of whether the policy covers patent infringement. We begin with the opinion cited and relied on by both parties. In Bank of the West, the Supreme Court of California addressed the issue of whether a similarly worded advertising injury policy provided coverage for a bank. The bank had advertised to insurance agents that it would provide financing for auto insurance through loans arranged by the agents unbeknownst to the purchasers, which loans carried significant undisclosed interest and penalties and which loan agreements could not be canceled or paid off prematurely. There, the Court first analyzed whether these acts, which had previously been held to constitute unfair business practices under applicable federal and state laws, qualified as unfair competition within the meaning of the policy. Following a lengthy analysis of the relationship between unfair business practice legislation (in general a regulatory tort) and unfair competition (a common law tort claim), and following a lengthy analysis of the role and purpose of insurance coverage in general, the Court concluded that the policy did not provide coverage for unfair business practices or for damages incurred by the insured as a result of its violation of such statutes. Bank of the West v. Superior Court, supra, 10 Cal.Rptr.2d 538, 833 P.2d at 553-55. Indeed, the Court there cautioned strongly against any alternative analysis, pointing out that the deterrent effect of such legislation would be lost were the wrongdoer permitted to shift the legislatively-mandated penalty to an insurer. Id., 10 Cal. Rptr.2d 538, 833 P.2d at 555.
Plainly, the analysis of the Court in Bank of the West supports defendants' and not plaintiff's position here. In the alternative, FileNet argues that the facts of this case are unique, that FileNet's products do not in fact infringe any Wang patent but that the advertising allegedly importuned customers to configure FileNet products in a pattern which was infringing and did so intentionally. This, FileNet argues, creates a situation in which there must be coverage because the advertising itself has created the injury complained of. Thus, FileNet argues, the Wang suit is not strictly speaking a patent infringement claim so much as it is an unfair competition claim, namely, inducing others to infringe a patent. Plainly, however, neither patent infringement per se nor any related claim can be said to fall within the language of the policy. To so hold would be to find that the parties went to considerable trouble to list numerous common law torts and numerous other specifically defined *1216 offenses but also intended to provide coverage for a separate and distinct class of claims, namely patent infringement, without so much as a passing reference to the concept or the theory. Such an analysis is wholly unsupported in the language of the policy or by the exercise of logic. We agree, in this regard, with the comment by the U.S. District Court in Virginia, applying California law, in St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Systems, 824 F.Supp. 583, 585 (E.D.Va.1993). In addressing and rejecting a similar argument, the District Court Judge wrote: "it is nonsense to suppose that if the parties had intended the insurance policy in question to cover patent infringement claims, the policy would explicitly cover infringements of `copyright, title or slogan', but then include patent infringement, sub silentio, in a different provision, by reference to "unauthorized taking of ... [the] style of doing business". Id. at 586. We agree with the logic and the result of this analysis, and we conclude, therefore, that patent infringement is not a covered offense nor included as a covered offense within the policy on its face.
Significantly, this coverage definition of the policy was altered in the middle of the time period in question, as a result of which we must separately analyze the effect of the changes in the coverage language against the overall issue of coverage and the specifics of the Wang complaint. The earlier primary policy period included in the covered offenses the language "unfair competition and piracy" while the later primary policy included in the place of that language the terms "misappropriation of advertising ideas or style of doing business". We first address whether either formulation includes patent infringement claims. With regard to the earlier language, defendants argue that nothing in those terms, taken in the context of the coverage language in general can be seen to afford coverage for the patent infringement claim raised by Wang. They cite a variety of opinions in support for the proposition that the quoted language offers coverage only for common law unfair competition claims which by definition do not include patent infringement claims. They cite in this regard Bank of the West v. Superior Court, 10 Cal.Rptr.2d 538, 833 P.2d at 555; Aetna Cas. & Sur. Co. v. Superior Court, 19 Cal.App.4th 320, 327-28, 23 Cal.Rptr.2d 442, 446 (Cal.App.4th Dist.1993); Repeat-O-Type Stencil Mfg. Corp. v. St. Paul Fire & Marine Ins., supra. slip opinion at 11; Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 35 Mass. App.Ct. 239, 244, 618 N.E.2d 1365, 1368 (Mass.App.1993). We agree with defendants' analysis and the reasoning expressed by these Courts.
Nothing in the phrase "unfair competition" can be fairly said to provide coverage for a claim of patent infringement. Thus, the language of the earlier policy, namely the covered offense of "unfair competition" does not provide coverage for plaintiff. Nor can it be said that the change in the policy language regarding advertising injuries provides coverage for this claim. There is no claim that FileNet "misappropriated" any advertising idea developed by Wang. FileNet is not charged with copying or mimicking the Wang advertisements. Indeed, it is not charged with using Wang's style of doing business or its advertising ideas. Neither of these phrases can be interpreted to mean that FileNet's alleged effort to infringe Wang's patent is a covered offense. In this respect, were we to agree with FileNet's analysis, we would in essence be holding that any wrong of any type relating to one's advertising, enumerated or not, is covered. Such a reading is unwarranted by the policy and unsupported by logic.
We turn next to the argument advanced by FileNet that the allegations raised in the Wang litigation give rise to coverage under the Personal Injury provision of the CGL policy. The language of the policy contained in the personal injury section is similar in concept to that contained *1217 in the advertising injury section, for it defines coverage in terms of injuries arising out of listed offenses. In this section, FileNet urges the Court to hold that there is coverage for allegations of patent infringement based solely on the offense defined as "publication or utterance of a libel, slander or other defamation or disparaging material". We need devote little analysis to this claim, for there is no suggestion in the Wang litigation or in any of the facts surrounding FileNet's alleged activities that FileNet engaged in any activity which even arguably falls within this offense as it is defined. FileNet is not charged with having stated anything derogatory or defamatory about Wang or its products in FileNet's advertising, which is the essence of the listed offenses. No reasonable interpretation of this clause could possibly extend it to include the claims made here and no reasonable party purchasing this coverage could possibly so interpret it.
FileNet next urges the Court to find that changes to the language defining the covered offenses beginning in April of 1987 make clear that, even if it could be said that there was no coverage for these claims under the prior policy, coverage in fact is included thereafter. In this regard, FileNet rests upon two alterations to the listed offenses. First, in the definition of libel and slander, the 1987 policy adds the phrase "or disparages a person's or organization's goods, products or services". Second, generally in place of the language defining unfair competition, the 1987 policy utilizes the definition "misappropriation of advertising ideas or style of doing business". In point of fact, the listed offenses in the later policy, overall, are markedly different in some regards. Gone, for example, is the "piracy" language relied upon by FileNet as the linchpin of its ambiguity argument, a matter we address further below. Gone, too, is the specific reference to "copyright". While no explanation is proffered by defendants regarding the reason for these changes, the issue here is whether any of these phrases can fairly be said to include claims of the sort that Wang is making against FileNet.
As with the personal injury analysis of the earlier policy, there is nothing in the allegations raised by Wang or in the patent infringement theory in general that can fairly be said to be disparaging. If patent infringement is essentially illegal imitation, then there can hardly be any serious argument that the alleged acts constitute product disparagement. The section defining the offense of "misappropriation" cannot fairly be found to include or refer to patent infringement, either, for it serves merely as a rephrasing of the previously covered offenses of misappropriation of trade dress, infringement of copyright and related common law torts. In this case, there is no claim that FileNet's advertising "misappropriated" Wang's advertising ideas or that it utilized in some fashion Wang's business style. In analyzing the change to the language, it appears that the earlier single section has been separated into two, one focusing on copyright violations and the other on the related common law business torts. Indeed, the earlier policy's broader "unfair competition" coverage seems to have been largely deleted. This more restrictive policy language, however, simply cannot be said to afford broader coverage in light of the fact that the enumerated offenses are in large measure more and not less restrictively defined.
FileNet next argues that, regardless of how one views the Wang complaint, the CGL policies and excess policies must be interpreted to provide coverage for this claim based on an alternate theory of contract construction. In this regard, FileNet argues that the definition of advertising injury contained in each policy is on its face ambiguous as a result of which the coverage question must be decided broadly and in favor of the insured. See Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 267 A.2d 527 (1970); Vantage Dev. Corp. v. American Environment Tech. Corp., 251 *1218 N.J.Super. 516, 598 A.2d 948 (Law Div. 1991). FileNet's focus in this aspect of its argument is upon the inclusion of the term "piracy" in the definitional section for advertising injuries as one of the enumerated and covered offenses. FileNet contends that this term is inherently ambiguous, because it is susceptible on its face to two interpretations, namely, (1) unauthorized publication, reproduction, or use of a copyrighted or patented work or (2) robbing of ships on the high seas. Because of this inherent ambiguity, FileNet urges the Court to construe this coverage term in its favor, so as to provide coverage for patent infringement or utilizing advertising to induce infringement. Defendants argue that the term piracy is not ambiguous at all, that even a broad reading of the Wang complaint would not give rise to allegations falling within the definitions urged by FileNet, and that under any circumstances the policy's definitions cannot be said to extend coverage to inducement of infringement through advertising.
While there are indeed published opinions which address the question of whether the use of the term "piracy" in an advertising injury policy definition is ambiguous on its face, it appears that the courts have uniformly rejected this analysis. See, e.g. Iolab Corp. v. Seaboard Surety Co., 15 F.3d 1500, 1506 (9th Cir. 1994); Nat. Union Fire Ins. Co. v. Siliconix Inc., 729 F.Supp. 77, 80 (N.D.Cal. 1989). Indeed, the suggestion that FileNet might have been misled or confused about coverage because it believed that the definition of advertising injury might actually include coverage for losses due to theft on the high seas is without merit. See American White Cross v. Continental Ins. Co., 202 N.J.Super. 372, 381-82, 495 A.2d 152 (App.Div.1985) (genuine ambiguity arises only where phrasing is confusing to average policy-holder). As a result, the suggestion that the use of the term is sufficiently ambiguous that it should afford coverage here is based upon fundamentally flawed logic. Even were we to agree that the term is ambiguous, in order to support a finding of coverage we would also be required to find that one of the possible definitions affords the coverage sought. Plainly, the alternate definition of piracy offered by FileNet, that of unauthorized reproduction or use of a protected product or ideas on its face does not describe the claims raised by Wang nor, by extension, afford coverage. The essence of the ambiguity argument is always (and must always be) that one definition provides coverage even if another does not. Here, there is at best a possible ambiguity which, upon close scrutiny, is meaningless in the context of the coverage afforded. Merely seizing on a word or phrase which under other circumstances might be ambiguous but having no bearing upon the allegations as between the parties and attempting to create coverage or duties thereby is inconsistent with the theory underlying coverage and with the usual rules governing insurance contract construction. In fact, in addressing claims of ambiguity, our Courts have cautioned against accepting strained interpretations, recently noting that we should not "torture the language of the [insurance] policy to create ambiguity". Stiefel v. Bayly, Martin & Fay, 242 N.J.Super. 643, 651, 577 A.2d 1303 (App. Div.1990). We, therefore, decline to hold that the inclusion of the term "piracy" as an alternate description of unfair competition in the earlier CGL policy is sufficient to support coverage for a patent infringement claim.
FileNet next argues that the policy affords coverage for the acts it is alleged to have engaged in because, technically viewed, Wang accuses FileNet of utilizing its advertising to induce others to infringe Wang's patents. The suggestion that inducing infringement through advertising should be a covered offense within the general "misappropriation" language is not novel. Courts in California, in interpreting similar policy language and similar allegations have rejected this argument. Aetna Cas. & Sur. Co. v. Superior *1219 Court, 19 Cal.App. 4th 320, 23 Cal. Rptr.2d 442, 448 (1993). In Classic Corp. v. Charter Oak Fire Ins. Co., 35 U.S.P.Q.2d 1726 (C.D.Cal.1995), the Court rejected the contention that a policy with similar language to the phrasing of the policies in issue here provided coverage for patent infringement either direct or induced because the focus of coverage is on the advertising, not on the underlying products. There the Court reasoned that were we to accept defendants' analysis, we would improperly shift the focus of coverage to the product and away from the advertising and the effects thereof. Clearly, the analysis of the Court in Classic Corp. is correct. As there is no coverage for patent infringement, there can be no coverage for utilizing one's advertising to induce patent infringement. To rule otherwise would be to distort the well settled principles governing contract construction by adding terms not arguably within the contemplation of the parties to the contract.
FileNet next argues that, regardless of the Court's analysis of the coverage terms, the "arising out of" language of the policy requires resolution of all questions in favor of coverage. This argument rests upon the definitional language of the primary CGL policies relating to advertising injuries and personal injuries. The policies in question contain within the definitions specific listed "offenses" and afford coverage for injuries "arising out of" these offenses. Regardless of the Court's interpretation of the meaning of the offenses themselves, FileNet urges the Court to give expansive reading to coverage solely by virtue of the existence of the "arising out of" language of these policies. This issue was raised and addressed in supplemental briefs filed following the release of the Appellate Division's decision in Pep Boys v. Cigna Indemnity Ins. Co., 300 N.J.Super. 245, 692 A.2d 546 (App.Div. 1997), which FileNet describes as new law.
The facts and issues of Pep Boys are instructive for our analysis. In that case, defendant Cigna issued a policy of insurance to Interdynamics which included coverage for bodily injury arising out of its products which were included on a schedule. The policy further included Vendors Insurance extending coverage to sellers of the products for injuries arising out of the products. The coverage dispute arose when a minor purchased freon (a covered Interdynamics product) from Pep Boys (a covered vendor of the Interdynamics product freon), inhaled it, and died as a result. Cigna declined coverage or a defense on the ground that the death was caused not by the product (which was covered) but because of the negligence of the store's staff in selling the product to a minor in the first place. The trial court agreed, but the Appellate Division reversed based in part on its analysis of the meaning of the phrase "arising out of". In the Pep Boys decision, the Appellate Division explored at length the general issues of interpretation of policies of insurance and the more specific issue of the "arising out of" language itself. In reaching its decision, the Court reiterated the essential principles of construction of insurance policies and held that the "arising out of" language must be interpreted broadly and comprehensively. While holding that the phrase "arising out of" is not inherently ambiguous, the Appellate Division held that in the plain language of the policy there in issue, it provided both coverage and by extension a duty to provide a defense against the claim raised by the heirs of the decedent. Id. at 255, 692 A.2d 546.
First, FileNet urges this Court to find that the Pep Boys decision creates new law, greatly expanding the meaning of the phrase "arising out of" in all insurance contexts and requiring this Court to interpret it to its farthest reaches to afford coverage here. In opposition to this analysis, defendants here argue that the Pep Boys decision is neither so broad nor, for that matter, directly applicable to this case. Rather, defendants argue that the analysis of the "arising out of" language in *1220 these policies must proceed in the context of the policies in which it appears and that the Pep Boys decision does not as a result create an entirely new rule of law regarding coverage in general.
The CGL policies before this Court first define coverage in terms of the specific covered offenses and second, provide coverage only if one or more of the offenses is committed or occurs in the course of advertising and finally limit coverage to an injury which arises therefrom. The phrasing of coverage is significant, for, as a result, in order to secure coverage, the policyholder must demonstrate a claim which meets all three levels of this test. In this context, FileNet's focus on the "arising out of" phrase is too narrow, for it ignores the other significant elements of coverage relevant to these particular policies. As a result, its reliance on Pep Boys is misplaced. There, while our Appellate Division indeed interpreted that phrase broadly, it did not do so in a context which cannot be seen to alter the rather strictly defined coverage afforded here. However broadly we may read the "arising out of" aspect of the coverage issue, it cannot create coverage which extends beyond the rather specifically defined elements and carefully delineated interrelationships between injuries and covered offenses. Thus, as a practical matter, the "arising out of" phrase might require (and applying the Pep Boys analysis would require) a broad interpretation of the causal link between the underlying offense and the injury, but it neither alters the interpretation of the covered offenses themselves nor expands the plain definition of the limiting phrase "course of your advertising activities". At most, it alters the appropriate analysis of the required relationship between the covered act and the injury complained of.
In a similar vein, the use of the phrase in the section defining coverage for personal injury does not eliminate the requirement for proof of existence of one of the covered offenses. In that portion of the policy, coverage again rests upon first, demonstration of a covered offense and second, analysis of whether an injury as to which coverage is sought arose out of that offense. At most, the "arising out of" language might alter the level of or type of proof of the causal link, but it does not and cannot fundamentally alter the other definitional elements required for a finding that there is coverage. In short, the policies in issue here are distinctly different from the policy under review in Pep Boys. There, the Court focused on the causal relationships between the product and the eventual injury, holding that the arising out of requirement could not be read so narrowly as to defeat coverage based upon misuse of a product not itself defective. But the Court there did not announce a broader rule of law nor, by extension, relieve plaintiff here of its obligation to demonstrate the other fundamental elements of coverage otherwise required. Indeed, we note that however broadly we might read the "arising out of" element here, the later post 1987 policies made clear its restrictive nature. The addition of the word "solely" into this causal link element in those policies under any analysis would create exactly the restriction urged by defendants. Indeed, that single added word underscores the continuing viability of the requirement that plaintiff must demonstrate the causal link between listed offense and injury in order for coverage to obtain.
The Court in Bank of the West reached a similar result, analyzing separately the issues of whether the injuries could be said to have occurred in the course of the advertising, and discussing a provision generally similar in concept to the FileNet policy's "arising out of" language. That Court noted that Courts have uniformly rejected claims lacking in an appropriate demonstration of a causal connection between the injury and advertising. Bank of the West v. Superior Court, supra, 10 Cal. Rptr.2d 538, 833 P.2d at 558-59. In part, the analysis of that Court forms a part of a *1221 broader "reasonable expectations of the parties to the contract" analysis, but in part, applied to the language of that policy, it simply gives weight to the coverage language itself. Id., 10 Cal.Rptr.2d 538, 833 P.2d at 559-60. Here, in the policies before this Court, the language is more restrictive in its requirement of a causal connection between the advertising and the alleged injury. We disagree with FileNet's suggestion that the Bank of the West analysis of the "arising out of" element independently supports a finding of coverage here.
We return, then to our starting point. The foregoing analysis makes clear that the policies in question do not provide coverage nor does the Wang litigation give rise to a sufficient potentiality for coverage to require defendants to undertake FileNet's defense. For all of the foregoing reasons, defendants' motion is granted and plaintiff's motion is denied.